In re **KAISER STEEL CORPORATION,** Debtor.

**VERMEJO PARK CORPORATION,** Vermejo Minerals Corporation, Pittsburg & Midway Coal Mining Company, Appellants,

v.

**KAISER COAL CORPORATION,** Kaiser Steel Resources, Inc.; Kaiser Steel Corporation, Southwestern Public Service Company, a New Mexico corporation; Quixx Corporation, a Texas corporation, Appellees.

No. 92–1231.

United States Court of Appeals, Tenth Circuit.

July 6, 1993.

Keith P. Ellison (Gregory R. Danielson of Poulson, Odell & Peterson and Glen E. Keller, Jr. of Davis, Graham & Stubbs, Denver, CO, with him on the briefs), of Baker & Botts, L.L.P., Houston, TX, for Vermejo Park Corp.

James G. di Zerega and Ray Gardner, Englewood, CO, for Pittsburg & Midway Coal Min. Co.

Harrie F. Lewis (Craig A. Christensen with him on the brief), of Lindquist, Vennum & Christensen, Denver, CO, for Kaiser Steel Corp.

Marvin W. Jones of Peterson, Farris, Doores & Jones, Amarillo, TX, for Southwestern Public Service Co. and Quixx Corp.

Before TACHA and BARRETT, Circuit Judges, and BROWN *, District Judge.

BARRETT, Senior Circuit Judge.

Appellants Vermejo Park Corporation and Vermejo Minerals Corporation (Vermejo) and the Pittsburg & Midway Coal Mining Co. (P & M) appeal from an order and judgment of the district court affirming the bankruptcy court and dismissing their appeals.

In February, 1987, Kaiser Steel Corporation and Kaiser Coal Corporation, hereinafter collectively referred to as Kaiser, filed reorganization petitions under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, in the United States Bankruptcy Court for the District of Colorado. In August, 1987, Kaiser initiated an Adversary Proceeding against Southwestern Public Service Company (SPS) and Quixx, SPS' wholly owned subsidiary, challenging the validity of a royalty claim by Quixx on Kaiser Coal's New Mexico coal mining property.

In January, 1989, Kaiser Coal filed an application for approval of the sale of its New Mexico coal mining property, whereby Kaiser Coal would convey its coal interest to P & M and its oil and gas interest and surface estate to Vermejo via two acquisition agreements. The Kaiser Coal/P & M Acquisition Agreement contained several provisions pertinent in this case:

Section 2.01, *Sale of Assets*, provided:

In reliance upon the representations and warranties of Buyer contained herein and subject to the terms and conditions set forth herein, at the Closing Seller shall sell to Buyer the Assets for the consideration set forth in Section 2.03.

(Appellees' Supplemental Appendix at 000086).

Section 3.01, *Excluded Assets*, provided:

Schedules 3.01 and 8.03 set forth any Assets that shall be retained by the Seller and not conveyed to Buyer pursuant to this Agreement.

\*      \*      \*      \*      \*      \*

---

\* The Honorable Wesley E. Brown, Senior Judge, United States District Court for the District of

*SCHEDULE 3.01*

Any pending or threatened litigation in which Seller has an interest, excluding the action against Southwestern Public Service Co. and Quixx Corp. set forth in Section 2.05 of the Agreement.

(*Id.* at 000088–89).

Section 2.05, *Quixx Corporation Royalty*, provided:

Quixx ... claims a royalty interest in all minerals produced from the Real Property. Seller maintains that said royalty interest is invalid and has instituted legal proceedings against Quixx and Southwestern [SPS] to set aside said royalty interest. If Seller succeeds in extinguishing, on or before the second anniversary of the Closing Date all royalty interests claimed by Quixx and/or Southwestern to the minerals in the Real Property, Buyer shall, within thirty (30) days of a final non-appealable judgment or settlement extinguishing said royalty interest, pay to Seller or Seller's designee the sum of One Million Dollars ($1,000,000.00). In addition to the above, if Seller succeeds in extinguishing the above described royalty at any time, all royalty payments placed in escrow prior to the Closing Date shall be the property of Seller, and all royalty payments placed in escrow after the Closing Date shall be the property of Buyer.

(*Id.* at 000087).

SPS appeared in opposition at the hearing on Kaiser Coal's application for approval of the proposed sales to Vermejo and P & M and submitted its own bid for the property. At the conclusion of the hearing, the bankruptcy court approved the sale of the property to Vermejo and P & M for $60.5 million. The sale closed on February 1, 1989.

Kaiser and SPS subsequently engaged in negotiations to settle the Adversary Proceeding. On May 8, 1990, Kaiser filed an application for approval of a settlement agreement with SPS wherein Kaiser and SPS agreed that: the New Mexico coal mining property would continue to be subject to the Quixx

Kansas, serving by designation.

royalty; SPS would pay $1,600,000.00 to the Kaiser bankruptcy estate; and Kaiser would dismiss the Adversary Proceeding with prejudice.

On May 31, 1990, Vermejo and P & M filed an objection to the proposed settlement agreement. Before the bankruptcy court ruled on their objection, Vermejo and P & M filed a motion to intervene in the Adversary Proceeding. On August 28, 1990, the bankruptcy court entered an order denying Vermejo's and P & M's objection, finding that they lacked standing to object to the settlement agreement:

The Objectors are not before this Court because of any asserted interest in Coal's bankruptcy estate. In fact, in none of their arguments do they suggest that the settlement will not benefit the Debtors' estates. The Objectors are before the Court only for the purpose of their self interest. They are not presently a creditor, but will only have an opportunity to arguably present a claim if the settlement is approved and the adversary proceeding is dismissed. Like the disgruntled purchaser in *Karpe*, these Objectors are not parties having an interest in Coal's estate and they are without standing in Coal's Chapter 11 proceeding to challenge the propriety of the settlement. *In re Karpe*, 84 B.R. 926 (Bankr.M.D.Pa.1988).

(Appellants' Appendix at 121).

On October 4, 1990, a hearing was conducted on the motion to intervene in the Adversary Proceeding. On October 29, 1990, the bankruptcy court denied Vermejo's motion to intervene, finding that Vermejo's Acquisition Agreement did not mention the Quixx royalty litigation. In the same order, the bankruptcy court found an ambiguity relative to P & M's ownership interest in the Quixx royalty litigation which had to be resolved in order to determine P & M's right to intervene as a party in interest in the Adversary Proceeding:

The contractual provisions leave the court with a host of unanswered questions. If the concept was that all rights in the Quixx litigation were being transferred to P & M, with Coal [Kaiser Coal] to continue the suit solely for P & M's benefit, then the agreement is missing the litany of provisions one would ordinarily expect to find such as undertakings by Coal to prosecute the case diligently and in good faith, rights retained by P & M to supervise, notice provisions, explicit provisions barring Coal from dismissing or settling the litigation absent P & M's approval, etc. On the other hand, if the intent of the agreement was to have all rights in the litigation remain with Coal, subject only to P & M's right to, in effect, buy the Royalty Interests from Coal for One Million Dollars if Coal succeeded, why was this restricted to only a two year period?

(*Id.* at 138).

Thereafter, the court set P & M's motion to intervene for hearing. During the evidentiary hearing, Donald F. Gottron, P & M's Vice–President of Engineering and Resource Development, testified:

Q. (Counsel for P & M): Mr. Gottron, would it be accurate to describe your role in both Kaiser transactions as the lead businessman on behalf of P & M?

A. I think that's correct.

Q. Now, in the course of preparing bids and entering into the transactions, did you make any assumptions regarding the Quixx royalty, any economic analysis of Kaiser I and II?

A. In both cases, we assumed that the royalty would have to be paid. We felt that we weren't able to predict for sure that the litigation would be successfully resolved in our favor and, consequently, we felt it was only prudent to put the value of those royalties as a cost against the mine in calculating its value for purposes of a bid, and that's what we did.

\*     \*     \*     \*     \*     \*

Q. Okay. Mr. Gottron, you mentioned there that our bid assumed that the royalty is valid; is that correct?

A. Yes.

Q. And what did you mean by that, Mr. Gottron?

A. Well, the same thing that I answered to your question a while ago; we couldn't be sure of the outcome of the litigation

and, consequently, we assumed that we were going to pay that royalty when we did the economics leading to this bid.

(*Id.* at 150–51).

During the same hearing, John Bachmann, P & M's lead counsel in relation to its purchase of the Kaiser Coal coal mining property and the person who drafted the Kaiser/Coal/P & M Acquisition Agreement "for the most part and negotiated it with representatives of Kaiser," (*id.* at 162), testified:

Q. (Counsel for P & M): Did Kaiser have any options, or did you intend for Kaiser to have any options with respect to the Quixx litigation under Section 2.05?

A. 2.05 is an incentive package, and the purpose of it was to get Kaiser to go forward with the action. The opportunities they had, as far as I was concerned, was, one, prosecute the litigation.... Secondly, our chief concern in that context was to get rid of the royalty. That was an asset; we wanted it free and clear.... So the idea was to get rid of it. They could have gotten rid of it then by settling, paid off part of the million, and bought out of it, but we wanted the royalty gone.

The third option they could have had if they didn't want to get into the million dollars or whatever, just walk away from it, leave the incentive and go home and say, no, I'm sorry, we don't want to be involved. Finally, and I didn't think about it at the time, but I suppose if they would have come back to us with some kind of good deal and said we can get rid of it, or we can reduce it and the economics looked good, fine, but if they couldn't dispose of it, if they couldn't eliminate it, they had to come talk to us, as far as I was concerned.

(*Id.* at 171–72).

Following the hearing, the bankruptcy court found that P & M had not acquired any ownership interest in the Quixx royalty litigation through its Acquisition Agreement whereby it "should be allowed to intervene ... as a party-in-interest to prosecute such claims in its own name and right." (*Id.* at 196). The court denied P & M's motion to intervene, finding:

The evidence has established that P & M priced the coal properties as if the royalty remained in effect. Thus, if Coal dismisses this action with prejudice, leaving the royalties outstanding, P & M will have received economically exactly what it bargained for. On the other hand, P & M has acknowledged that the $1,000,000 it would pay to Coal if the royalty is voided is less than the real value of the royalty. Thus Coal will be deprived of a full recovery.... If Coal is permitted to consummate its settlement with the defendants herein and dismiss this case, Coal will have maximized its economic benefit and P & M will not receive a windfall but instead will have the benefit of the full value of that which is purchased.

(*Id.* at 204).

On July 3, 1991, the bankruptcy court approved the settlement agreement and on November 15, 1991, entered its judgment dismissing the Adversary Proceeding.

The district court affirmed the bankruptcy court, concluding:

If the judge is correct ... and I think that he is—that the appellees [sic] are not creditors, are not parties in interest, and are not permitted to intervene in the lawsuit, then it follows that they do not have standing to object to the settlement and they do not have standing to appeal the approval of the settlement.

Since I can find no error in [the bankruptcy judge's] decision—and certainly he did in making his decision look carefully at the agreements in question, he tried to analyze the wording of the paragraphs, he pointed out that it was anticipated that in the contract provision that the sale price was subject to the royalty interest from the reading. That appears to be a correct decision.

I think he was correct in his analysis that there was some ambiguity between the section 2.05 provision and the section 3.01 provision, squaring them together. Pretty difficult to measure those provisions.

I come to the conclusion that indeed [the bankruptcy judge] was correct on his various findings of not being creditors, not

being parties in interest, having no right to intervene, and therefore having no standing.

(*Id.* at 308).

On appeal, Vermejo and P & M contend, *inter alia*, that the district court erred in affirming the bankruptcy court's orders that they lacked standing to object to the settlement agreement and that they had no right to intervene in the Adversary Proceeding. Vermejo and P & M assert that they had an absolute right to intervene in the Adversary Proceeding as owners of the New Mexico properties. They also claim a right to intervene due to Kaiser's assignment of the pending proceeding to P & M through P & M's unambiguous Acquisition Agreement.

### I. Standing to Challenge the Settlement Agreement

Vermejo and P & M filed an objection to the settlement agreement entered into by Kaiser and SPS which left the Quixx royalty intact. The district court affirmed the bankruptcy court's ruling that Vermejo and P & M lacked standing to so object.

> [T]he bankruptcy judge found that they [Vermejo and P & M] were not creditors; that they were not parties in interest, and therefore that they had no standing to object to the settlement agreement. Vermejo and P & M needed to show some interest in the amount that the settlement would enhance the bankruptcy estate. . . . [T]his court is satisfied that the finding of the bankruptcy court that only creditors of the estate can show interest in this amount that's coming into the estate and have standing to object to it is a correct decision.

(*Id.* at 307).

Further, the district court addressed Vermejo's and P & M's contention that, as debtors of the debtor, they were parties in interest, referencing *In re Wolf Creek Valley Metro. Dist. No. IV,* 138 B.R. 610 (D.Colo.1992). The district court indicated that *Wolf Creek* involved particular circumstances which distinguish it from the instant case. The district court ruled that the argument that Vermejo and P & M were debtors of the debtor,

and thus entitled to challenge the settlement agreement, was misplaced. We agree.

Standing is a question of law which is reviewed *de novo. Riggs v. City of Albuquerque,* 916 F.2d 582, 584 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1623, 113 L.Ed.2d 720 (1991). "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). Under the Bankruptcy Code, 11 U.S.C. § 102(3), the word "including" is not a limiting term, and therefore, "party in interest" is not confined to the list of examples provided in section 1109(b). *In re Amatex Corp.,* 755 F.2d 1034, 1042 (3d Cir.1985). Bankruptcy courts "must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation." *Id.*

To have standing, Vermejo and P & M must fall within the definition of "parties in interest." Neither Vermejo nor P & M is obligated under its respective Acquisition Agreement to pay an additional one million dollars to Kaiser. Accordingly, neither qualifies as a debtor of the debtor. The Kaiser Coal/Vermejo Acquisition Agreement makes no mention of the Quixx royalty litigation; therefore, lacking further obligation to Kaiser, Vermejo cannot be considered a debtor of the debtor. Similarly, P & M cannot be considered a debtor of the debtor, since it was not obligated to pay an additional one million dollars to Kaiser under the Quixx royalty provision included in the Kaiser Coal/P & M Acquisition Agreement, unless and until Kaiser succeeded in extinguishing the royalty. On the face of the Acquisition Agreements, neither Vermejo nor P & M is obligated to Kaiser.

We affirm the district court's finding that neither Vermejo nor P & M has standing to object to the settlement agreement, as neither is a party in interest.

## II.   Intervention of Right

In their motion to intervene in the Adversary Proceeding, Vermejo and P & M contended that they had an interest in and a right to intervene in the proceeding because of their ownership in the New Mexico properties and because Kaiser had unambiguously assigned its interest in the Adversary Proceeding to P & M through the Kaiser Coal/P & M Acquisition Agreement.

Following an initial hearing, the bankruptcy court found that neither Vermejo nor P & M could intervene of right simply by reason of ownership in the coal lands. (Appellant's Appendix ∴ 133, 135). The court ruled that the outcome of the Adversary Proceeding would have no impact on the ownership interests of Vermejo and P & M, and thus, "if a right to intervene exists, it must be found elsewhere." (*Id.* at 135). In this same order, the court observed that the only other potential source of a right to intervene was the Acquisition Agreements. Noting that nothing in Vermejo's Acquisition Agreement referenced the Quixx royalty litigation, the court found that Vermejo had no protectable interest and thus no right to intervene. Regarding P & M's Acquisition Agreement, the court found that P & M's ownership interest was ambiguous and would require further examination. Following an evidentiary hearing on the parties' intent regarding P & M's interest in the Adversary Proceeding, the bankruptcy court denied P & M's right to intervene. Vermejo and P & M contend that the bankruptcy court erred in finding the Kaiser Coal/P & M Acquisition Agreement ambiguous.

### *Ambiguity of Kaiser Coal/P & M Acquisition Agreement*

Vermejo and P & M argue that Schedule 3.01 of the Kaiser Coal/P & M Acquisition Agreement unambiguously states that Kaiser retained all pending or threatened litigation in which it had an interest, except the litigation against SPS and Quixx which Kaiser conveyed to P & M. They further argue that the language in Section 2.05, under which P & M agreed to pay Kaiser an additional one million dollars if Kaiser was successful in extinguishing all royalty interests claimed by Quixx, did not create an ambiguity.

Interpretation of an unambiguous contract is a question of law and therefore reviewable *de novo* on appeal. *In Re Amarex,* 853 F.2d 1526, 1529 (10th Cir.1988). "The determination of ambiguity of a contract is similarly a question of law." *Id.* at 1530. Only in the event of an ambiguity does a court resort to extrinsic evidence. *Id.; In Re Yeates,* 807 F.2d 874, 878 (10th Cir.1986). *See also Paperchase Partnership v. Bruckner,* 102 N.M. 221, 693 P.2d 587 (1985); *Shaeffer v. Kelton,* 95 N.M. 182, 619 P.2d 1226 (1980) (the construction of a written instrument and the degree to which it expresses terms of a contract are questions of law for the court, but once it is determined that a contract is ambiguous, its construction depends upon extrinsic facts and circumstances for the trier of fact to decide); *Polemi v. Wells,* 759 P.2d 796, 798 (Colo.Ct.App. 1988); *Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.,* 195 Colo. 253, 577 P.2d 748, 750 (1978) (once a contract is determined to contain ambiguity and the ambiguity cannot be resolved by reference to other provisions in the contract, the court must admit extrinsic evidence in order to determine the mutual intent of the parties at the time of contracting, and such intent is an issue of fact to be determined in the same manner as other disputed factual issues). Applying these standards to the facts herein, we hold that the bankruptcy court did not err in finding the Kaiser Coal/P & M Acquisition Agreement ambiguous.

As set forth *supra,* Schedule 3.01 of the Kaiser Coal/P & M Acquisition Agreement provided that Kaiser would retain, and not convey to P & M, "[a]ny pending or threatened litigation in which Seller [Kaiser] has an interest, excluding the action against Southwestern Public Service Co. and Quixx Corp. set forth in Section 2.05 of the Agreement." As the bankruptcy court found, "[i]t appears clear ... from the language of Schedule 3.01 ... that it was contemplated by the parties that P & M would have some interest in the lawsuit." (Appellants' Appendix at 139.)

However, Schedule 3.01 references and therefore must be read together with Section

2.05 which does not indicate what interest, if any, P & M would retain in the Adversary Proceeding. Rather, Section 2.05 provided that: Quixx claimed a royalty interest in the New Mexico properties; Kaiser maintained that the royalty interest was invalid; Kaiser had instituted legal proceedings to set aside the royalty interest; and that if Kaiser succeeded in extinguishing Quixx's royalty claims "on or before the second anniversary of the Closing Date," P & M would pay Kaiser an additional one million dollars.

As the bankruptcy court noted, Schedule 3.01 and Section 2.05 of the Kaiser Coal/P & M Acquisition Agreement give rise to varied interpretations. Perhaps all rights in the Quixx royalty litigation were transferred to P & M; perhaps all rights remained with Kaiser subject to P & M's right to purchase the royalty interest if Kaiser succeeded in extinguishing Quixx' claim. In view of the ambiguity created by Schedule 3.01 and Section 2.05, we hold that the bankruptcy court did not err in resorting to extrinsic evidence to interpret the Kaiser Coal/P & M Acquisition Agreement. The ambiguity could only be resolved by considering extrinsic evidence in order to ascertain the intent of the parties at the time of contracting. Following the evidentiary hearing, the court found that P & M could not demonstrate a "significantly protectable interest" in the Adversary Proceeding which would warrant intervention.

Under 11 U.S.C. § 1109(b), a party in interest may appear and be heard on any issue in a case; however, that "does not afford a right to intervene under Rule 24(a)(1), even though such 'parties in interest' enjoy the general right to 'monitor' the progress of the chapter 11 case." *In re Thompson*, 965 F.2d 1136, 1142 n. 8 (1st Cir.1992). Intervention in a bankruptcy case and intervention in an adversary proceeding conducted in the bankruptcy case must be sought separately. "An entity asserting a protectable interest in an adversary proceeding, yet not a 'party in interest' to the larger bankruptcy case, must first seek intervention in the bankruptcy case under Bankruptcy Rule 2018." *In re Thompson*, 965 F.2d 1136 at 1141 n. 7; *see also In re Charter Co.*, 50

B.R. 57, 61 (Bankr.W.D.Tx.1985); Fed. R.Bankr.P. 7024 Advisory Committee Note. "[N]onparty participation in an adversary proceeding is dependent on intervention." *In re Thompson*, 965 F.2d 1136 at 1140 (1st Cir.1992); *see also In re Latimer*, 918 F.2d 136, 137 (10th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 186, 116 L.Ed.2d 147 (1991).

"[I]ntervention in an adversary proceeding is governed by Rule 24 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by virtue of Rule 7024 of the Federal Rules of Bankruptcy Procedure." *In re St. Theresa Properties, Inc.*, 152 B.R. 852, 853 (S.D.N.Y.1993). To intervene of right, Rule 24(a) provides:

> Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

An intervenor under Rule 24(a)(2) must meet the following requirements: (1) submit a timely application to intervene, (2) demonstrate an interest in the property or transaction, (3) show that the intervenor's ability to protect such interest might be impaired, and (4) demonstrate that the interest is not adequately represented by the existing parties. *In re Thompson*, 965 F.2d at 1142.

Regarding the second requirement, the interest claimed by the applicant, "[u]nder Bankruptcy Rule 7024, the putative intervenor must show that he has a 'significantly protectable interest' in the adversary proceeding." *In re Thompson*, 965 F.2d at 1143 n. 12; *see also Donaldson v. United States*, 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971). Furthermore, intervention requires that this interest in the proceedings be "direct, substantial, and legally protectable." *United States v. Perry*

County Bd. of Educ., 567 F.2d 277 (5th Cir. 1978); *see also In re Environmental Elec. Sys., Inc.*, 11 B.R. 962, 964 (N.D.Ga.1981). "[T]he mere existence of a third person's contingent interest in the outcome of pending litigation is insufficient to warrant intervention of right." *In re Environmental*, 11 B.R. at 964; *see also Kheel v. American S.S. Owners Mut. Protection and Indem. Ass'n*, 45 F.R.D. 281 (S.D.N.Y.1968).

■ We need not address all four requirements which give rise to a right to intervene, inasmuch as both Vermejo and P & M have failed to show that they have a "significantly protectable interest" in the Adversary Proceeding. As the bankruptcy court and district court found, Vermejo did not establish an interest in the Adversary Proceeding because no mention was made of the Quixx royalty interest or of any litigation involving it in the Kaiser Coal/Vermejo Acquisition Agreement. Regarding P & M's interest, Gottron, P & M's Vice–President of Engineering and Resource Development, testified that P & M assumed that the Quixx royalty was valid and took this into account when developing the economics for its bid. Bachmann, P & M's counsel for the purchase of the properties, testified that, in drafting section 2.05, he intended that one of Kaiser's options would be to walk away from the one million dollar incentive. The bankruptcy court and the district court recognized that in the Kaiser Coal/P & M Acquisition Agreement the parties mutually intended that all rights in the Quixx litigation remained with Kaiser and were not transferred to P & M.

Neither P & M nor Vermejo has met the burden imposed by Fed.R.Civ.P. 24(a) and Rule 7024(a)(2) of the Bankruptcy Rules: neither has established a "significantly protected interest" in the Adversary Proceeding. Accordingly, intervention of right is not warranted.

**AFFIRMED.**