In re **MANCHESTER GAS STORAGE, INC.,** an Oklahoma corporation, **MGL, Inc.,** an Oklahoma corporation, Debtors.

Nos. 00–04780–R, 00–04781–R.

United States Bankruptcy Court, N.D. Oklahoma.

Jan. 28, 2004.

John Howland, Rosenstein, Fist & Ringold, Tulsa, OK, for Movant, William H. Davis.

Patrick O'Connor, Moyers, Martin, Santee, Imel & Tetrick, LLP, Tulsa, OK, for Steven A. Arnold.

### ORDER SUSTAINING OBJECTION TO CLAIMS OF STEVEN A. ARNOLD

DANA L. RASURE, Bankruptcy Judge.

Before the Court is the Objection to Claims of Steven A. Arnold (Doc. 466)[1] filed by creditor and shareholder William H. Davis on May 14, 2003, and the Response and Objection of Steven A. Arnold to William H. Davis' Objection to Claims ("Arnold's Response to Objection") (Doc. 467) filed on June 16, 2003. An evidentiary hearing on this contested matter was held on August 28, 2003, at which William H. Davis ("Davis") appeared in person and through his counsel, John Howland, and Steven A. Arnold ("Arnold") appeared in person and through his counsel, Patrick O'Connor. The parties submitted Joint Stipulations of Fact ("Stipulation") (Doc. 477) and jointly submitted a set of exhibits. The Court heard the testimony of three

1. As a result of the Court's recent conversion to electronic case filing (CM/ECF) on December 1, 2003, the implementation of a different docketing protocol has caused docket numbers for pleadings docketed under the previous system (NIBS) to be superceded. The docket numbers referred to herein (i.e., "Doc. X") are the docket numbers that appear on the CM/ECF docket, rather than the NIBS docket number that is hand-written on the imaged pleadings.

witnesses. In further support of their positions, the parties also filed the following—

- Memorandum of Authorities of Steven A. Arnold in Connection With Entitlement to Post–Petition Interest and Attorney Fees ("Interest and Attorney Fee Memorandum") (Doc. 479), filed on August 27, 2003;
- Memorandum of Authorities of Steven A. Arnold in Connection With Issue of Consideration for December 14, 2000 Agreement ("Consideration Memorandum") (Doc. 478), filed on August 27, 2003;
- Post–Trial Brief of William H. Davis Supporting His Objection to the Claims of Steven A. Arnold ("Davis's Post–Trial Brief") (Doc. 488), filed on September 15, 2003;
- Response of Steven A. Arnold to Post–Trial Brief of William H. Davis (Doc. 497), filed on October 9, 2003 ("Arnold's Response to Post–Trial Brief"); and
- Brief of William H. Davis in Reply to New Matters Presented in the Response Brief of Steven A. Arnold to Post–Trial Brief of William H. Davis (Doc. 498), filed on October 24, 2003.

Upon consideration of the stipulations, the evidence and arguments presented at trial, the briefs and the applicable law, the Court finds and concludes as follows:

## I. Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(A), (B) and (O); Miscellaneous Order No. 128 of the United States District Court for the Northern District of Oklahoma; Order of Referral of Bankruptcy Cases effective July 10, 1984, as amended; and Paragraphs A, B, C, E and J of Article VIII of the Second Amended Joint Plan of Reorganization, which was confirmed on July 12, 2001 (the "Plan"). Arnold Exhibit 17 (Docs. 316, 317).

## II. Findings of fact

Debtors Manchester Gas Storage, Inc. ("MGS") and MSL, Inc. ("MGL") filed their petitions for relief under Chapter 11 of the Bankruptcy Code on December 18, 2000. Davis was president, sole director and sole shareholder of MGS and MGL. Stipulation at 6, ¶ 25. Pursuant to an Employment Contract dated March 13, 2000 (the "Employment Contract"), Arnold was vice president and chief operating officer of MGS and vice president and chief financial officer of MGL. Stipulation at 1, ¶¶ 1, 2; Arnold Exhibit 2 at 1, § 1. Under the same contract (and for the same compensation). Arnold served as vice president and chief financial officer for a non-debtor company also owned by Davis. Davis Operating Company ("DOC"). Arnold Exhibit 2 at 1, § 1. Although Arnold had duties to MGL and DOC, the parties to the Employment Contract stipulated that—

> the relationship created by this Contract between MGS and ARNOLD is strictly that of employer and employee and nothing more. The parties further stipulate that DOC and MGL are third party beneficiaries to this Agreement, and can enforce all of the terms and conditions herein to the same extent as MGS. . . .

Arnold Exhibit 2 at 13, ¶ 12.3.

The Employment Contract provided that Arnold would be employed for a term of five years at an annual base salary of $90,000 per year. Stipulation at 2, ¶ 3; Arnold Exhibit 2 at 2, ¶ 5.1. Arnold was required to "devote his full time and attention to the duties assigned to him and shall serve the Company [defined as MGS, MGL and DOC combined] exclusively." Stipula-

tion at 3, ¶ 9; Arnold Exhibit 2 at 2, § 4. Section 8 of the Employment Contract provided that Arnold would receive medical and life insurance and other benefits "to the extent that the same or similar benefits are available to all employees of MGS" and that Arnold would be reimbursed for out of pocket expenses incurred in connection with his employment. Stipulation at 2, ¶ 4; Arnold Exhibit 2 at 10, § 8.

Arnold was also afforded the opportunity to earn additional compensation in the form of bonuses. Paragraph 5.2 of the Employment Contract provided for a signing bonus to Arnold, not to exceed the sum of $11.220 (the "Signing Bonus"). Arnold Exhibit 2 at 3, ¶ 5.2. Paragraph 5.3 of the Employment Contract provided that Arnold would be entitled to a trading bonus from MGL based upon a percentage of the net amount of trading gains (as defined in the Employment Contract) during each fiscal year ("MGL Trading Bonus"). Stipulation at 2, ¶ 6; Arnold Exhibit 2 at 3, ¶ 5.3. Paragraph 5.4(B) of the Employment Contract provided for a discretionary bonus to Arnold based upon Arnold's ability to make a significant impact on MGS's net profit prior to April 1, 2002 ("Discretionary Bonus"). Stipulation at 2, ¶ 7; Arnold Exhibit 2 at 4, ¶ 5.4(B). Davis had discretion to determine the amount of the Discretionary Bonus. *Id.*

Finally, paragraph 5.6 of the Employment Contract created a right to additional compensation—

[u]pon the sale of MGS, or upon sale of all of the assets of MGS, ... if such transaction: (i) arises on or after April 1, 2002, and (ii) is consummated during the term of ARNOLD's employment under this Contract, or any extensions or renewals thereof. ...

(the "MGS Sale of Business Bonus"). Arnold Exhibit 2 at 5, ¶ 5.6; Stipulation at 2,

¶ 8. The amount of the MGS Sale of Business Bonus was to be calculated as follows—

After payment (or repayment/return, as the case may be) of all MGS' liabilities and obligations not assumed by the purchaser in such sale, including but not limited to: (i) all current and long-term debt of any nature whatsoever (including both principal and interest), (ii) all sums (including both principal and interest) of any nature whatsoever, advanced by, or due to, [Davis], his successors or assigns, and/or (iii) cushion gas obligations. ARNOLD shall be entitled to receive the applicable percentage (which in no event shall exceed two and one-half percent (2½ %) shown immediately below[) ] of the remaining net gain, if any. The product so determined shall be the "MGS Sale of Business Bonus." Said bonus to be in effect at the same percentages immediately listed below for a term of two (2) years from the date of Arnold's termination unless said termination is for the reasons described in sections 10.1 C. E & G.

| Year of Sale | Percent of Net Gain |
|---|---|
| 4/1/02—12/31/02 (short year) | 1% |
| 2003 | 1½ % |
| 2004 | 2% |
| 2005 | 2½ % |

\*　\*　\*　\*　\*　\*

F. Nothing contained herein shall limit MGS, in [Davis's] sole discretion, from waiving the time restriction in which ARNOLD becomes eligible to receive the MGS Sale of Business Bonus, if any.

Arnold Exhibit 2 at 5–6, ¶¶ 5.6(A) and (F). In addition, the Employment Contract provided that—

The parties agree hereto and recognize that the applicable percentages used to calculate ... the MGS Sale of Business Bonus may be modified, from time-to-time, by mutual agreement of the parties, during the term or any renewal or

extension of this Contract, to reflect un-anticipated changes in the corporate structure of the Company which could occur from time to time.

Arnold Exhibit 2 at 6, ¶ 5.7. To the extent that Arnold became eligible for the MGS Sale of Business Bonus, such bonus was to be "pro-rated in the event of termination for reasons as described in paragraphs 10.1 A. 10.1 B, 10.1 D and 10.1 F. Said bonus[ ] ... shall not be pro-rated for circumstances of termination as described in sections 10.1 C, 10.1 E and 10.1 G." Arnold Exhibit 2 at 2, ¶ 5.1.

The termination provisions of the Employment Contract state, in relevant part—

> This Contract shall terminate upon oc-currence (the "Termination Date") of the first of the following events:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> B. Upon thirty (30) days' prior writ-ten notice by MGS to ARNOLD (pro-vided however, in such event AR-NOLD shall be entitled to $60,000.00 in termination compensation, payable in six (6) monthly installments of $10,000. Arnold shall be entitled to same "additional benefits" as de-scribed in paragraph "A" of section 8[ ] ]; or
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> E. Upon breach of any condition or covenant contained herein; or
>
> F. MGS may terminate ARNOLD's employment if any of the following events occur pursuant to an arm's length transaction:
>
> 1. The sale of all or substantially all of the MGS' assets to a single purchaser or group of associated pur-chasers;
>
> 2. The sale, exchange or other dis-position, in one or more transactions, of Fifty Percent (50%) or more of MGS' outstanding shares:
>
> 3. MGS' decision, in its sole discre-tion, to terminate its business and liq-uidate its assets; or
>
> 4. The merger or consolidation of ... MGS into another entity, in a transaction in which the MGS' share-holders receive Fifty Percent (50%) or less of the outstanding and voting shares of the successor entity.

Arnold Exhibit 2 at 11–12, ¶ 10.1.

The Employment Contract provided that "[n]o amendment or modification of the terms of this Contract shall be binding upon any party hereto unless first reduced to writing, approved by resolution of the Board of Directors of Company, and signed by ARNOLD and the duly author-ized officers of Company." Arnold Exhibit 2 at 13, ¶ 12.6.

Neither Arnold nor MGS requested the Court to approve the assumption by MGS of the Employment Contract and therefore the contract was never assumed. Stipula-tion at 6, ¶ 28. Arnold performed his obli-gations under the contract from its incep-tion through the effective date of the Plan (July 23, 2001) for which MGS paid Arnold a salary and insurance benefits at the rates provided for in the Employment Contract.

In July 2000, broker Bruce Craig identi-fied Salt Plains Storage (and its affiliates) ("SPS") as a potential buyer for the Man-chester Gas Storage Facility (the "Man-chester Facility") and negotiations for such an acquisition commenced. Stipulation at 4, ¶ 16, 17. From July 2000 to December 12, 2000. Arnold spent a significant por-tion of his time working on the terms and conditions of a sale of the Manchester Facility to SPS and responding to requests for information from SPS in connection with its due diligence investigation. Stipu-

lation at 3, ¶ 13, 18.[2] Other professionals, including legal professionals, also rendered significant services in connection with the negotiation and drafting of the purchase agreement for the sale of MGS assets.

On December 12, 2000, MGS, MGL and SPS entered into an Asset Purchase Agreement in which SPS agreed to purchase the Manchester Facility and to assume certain contracts in the context of a prospective Chapter 11 bankruptcy proceeding to be filed by MGS and MGL. Arnold Exhibit 3. In the Asset Purchase Agreement, the Manchester Facility was defined as "the natural gas underground storage facility owned by the Manchester Group, located in Grant County, Oklahoma, and established by the OCC's issuance of the OCC Certificate and FERC's issuance of the FERC Authorization." *Id.* at 5. The agreement further enumerated assets of MGS and MGL that were *excluded* from the sale, including minute books and stock records; a natural gas pipeline; assets owned by MGS and MGL not related to the storage facility; the ongoing businesses of MGS and MGL; cash and credit balances; four natural gas wells and associated equipment, pipelines and minerals; and a list of other miscellaneous assets, including pipe, fittings, and additional mineral interests. *Id.* at ¶ 2.2 and Schedules 2.2.2, 2.2.6, and 2.2.7. In addition, a $648,000 receivable, a Lexus automobile, and a tax refund, all owned by MGS, were excluded from the sale. Arnold Exhibit 15 at 16.

On or about December 14, 2000, Arnold and Davis entered into a letter agreement which states in its entirety—

December 14, 2000

Mr. William H. Davis

President

Manchester Gas Storage, Inc.

2800 Mid–Continent Tower

Tulsa, OK 74103

Dear Mr. Davis:

Regarding our conversations regarding the sale of MGS and MGL to Salt Plains Storage, Inc., per my employment contract with Manchester Gas Storage, Inc., dated March 13, 2000, I understand that the transaction is now complete.

In conversation regarding the Sale of Business bonus, you have agreed that per Section 5.6(F) of my employment contract with MGS, in your sole discretion, to waive the time restriction outlined in Section 5.6(A), and determine that I am eligible for a sale of business bonus, having met all other requirements for such bonus. Also, that per Section 5.7 this bonus can be modified during the term of the contract, by mutual agreement to reflect unanticipated changes in corporate structure, we have agreed on a sale of business bonus in the amount of $150,000 due to the pending sale of Manchester to Salt Plains Storage, Inc.

In addition, as we have discussed, I am eligible to be paid a signing bonus of $11,220, a discretionary bonus on the buyout of the Terra contract of $25,000, and a trading bonus of $18,853. The trading bonus may be modified by collections of receivables from EDF Man and Mountain Energy, by an additional

---

**2.** The parties stipulate that in July 2000. Arnold spent approximately 20% of his time on work related to the investigation by SPS or its affiliates into acquiring an equity interest in MGS or acquiring the Manchester Facility, and about 40% of his time in August and September 2000; about 10% of his time from October 11–30, 2000; and approximately 75% of his time from November 1, 2000 to December 18, 2000, Stipulation at 5, ¶ 19. This work was within the scope of duties otherwise required under the Employment Contract. Stipulation at 5, ¶ 20.

20% of the amounts collected for physical and financial trades.

Very truly yours,

/s Steve Arnold

Steve Arnold

If you are in agreement with the above, please execute this letter and return a copy to me.

/s/ William H. Davis December 15, 2000
William H. Davis Date

Arnold Exhibit 4 (the "December 14th Letter Agreement"). Prior to December 14, 2000, no "unanticipated changes in the corporate structure" of MGS, MGL or DOC occurred to trigger paragraph 5.7, the provision permitting modification of the percentage of net gain from the sale of MGS that would constitute the amount of the Sale of Business Bonus. None of the companies experienced a merger, dissolution, change in equity ownership, creation of new class of stock or change in form. Stipulation at 3, ¶ 12: Transcript of Evidentiary Hearing of August 28, 2003 ("Transcript") (Doc. 492) at 39–41. At all relevant times, MGS and MGL were subchapter S corporations owned solely by Davis. No corporate resolution indicating approval of the December 14th Letter Agreement by MGS's officers or board of directors was introduced or admitted into evidence. Transcript at 39.[3] Neither Arnold nor MGS requested that the Court approve the assumption by MGS of the December 14th Letter Agreement, and thus the agreement was not assumed. Stipulation at 6, ¶ 28.

On December 18, 2000, MGS and MGL filed bankruptcy. Arnold became chief operating officer of MGS and MGL and assumed the role of the person responsible for discharging the duties of MGS and MGL as debtors in possession. Stipulation at 6, ¶ 25. Davis continued as president, sole director and sole shareholder of MGS and MGL. *Id.*

On December 22, 2000, MGS and MGL filed motions seeking approval of sale procedures and approval of the sale of the Manchester Facility to SPS. Stipulation at 6, ¶ 29; Arnold Exhibit 7. On January 19, 2001, the Court approved certain bidding and sale procedures to insure that the Debtors obtained the highest possible price for the assets and scheduled a hearing to approve the sale to SPS or a higher bidder for February 14, 2001. Arnold Exhibit 8. Arnold coordinated the sale process on behalf of MGS and MGL so as to effectuate a sale to the highest bidder. Stipulation at 6, ¶ 30. At the sale hearing, the Court approved the sale of the Manchester Facility to SPS for $42,200,000, subject to certain closing adjustments. Stipulation at 6–7, ¶ 31.

On February 21, 2001, the Court entered an Order Approving (i) Sale of Manchester Gas Storage Facility Free and Clear of All Claims, Liens, Interests and Encumbrances Subject to the Terms of a Purchase and Sale Agreement and (ii) Assumption and Assignment of Certain Executory Contracts. Arnold Exhibit 10. The sale closed on February 26, 2001. Stipulation at 7, ¶ 31. After subtracting the closing adjustments and sales tax, the Debtors received net proceeds of $40,059,888. *Id.* On April 19, 2001. $18,578,008.06 was paid to secured lenders. Due to significant disputes between and among MGS, MGL, Davis and creditors of the estate holding claims exceeding $200 million, the amount of liabilities to be paid from the proceeds (and thus the "net gain" from the sale, as that term is used in the Employment Contract) could not be determined until all such claim disputes were resolved.

---

**3.** At the time, MGS's officers were Davis, president; Arnold, vice president; Tony Benevides, treasurer; and Theresa Lamareaux, secretary. Transcript at 39.

On February 28, 2001, the bar date that had been set for filing proofs of claim, Arnold timely filed a proof of claim for "unpaid compensation for services performed from 10/2000 to 12/2000," asserting an unsecured prepetition claim in the total amount of $205,073, consisting of—

1. Signing bonus $ 11,220
2. Discretionary bonus $ 25,000
3. MGL Trading bonus $ 18,853
4. MGS Sale of Business bonus $150,000

MGS Proof of Claim No. 42 (the "First POC"); [4] Arnold Exhibit 11. In support of his claim, Arnold attached to the First POC his Employment Contract but not the December 14th Letter Agreement.

On March 23, 2001, Davis and Arnold entered into a letter agreement in which Davis agreed to advance Arnold the sum of $31,220 "for the signing bonus and discretionary bonus items listed on [Arnold's] Proof of Claim." Arnold Exhibit 12. According to the letter agreement, Arnold is required to repay the advance "[w]hen the proceedings before the bankruptcy court are concluded and if [Arnold is] paid in the full amount of [his] claim." *Id.* Davis Operating Company paid Arnold $31,220 by check on March 23, 2001. Stipulation at 7, ¶ 35; Arnold F Exhibit 13.

On March 22, 2001, Arnold was elected president of MGS and MGL (apparently by Davis as the sole shareholder). Stipulation at 7, ¶ 36. On April 3, 2001, MGS and MGL filed a Disclosure Statement and Joint Plan of Reorganization. Stipulation at 7–8, ¶ 37. The Plan provided for the liquidation of the Debtors under the administration of a Plan Agent. Consequently, Arnold became aware that his employment by MGS would be terminated upon confirmation of the Plan.

By virtue of a letter dated May 17, 2001, Arnold, acting as president of MGS, gave notice to himself that his employment would be terminated pursuant to paragraph 10.1(B) of the Employment Contract. The termination letter states, in its entirety—

May 17, 2001

Steve Arnold

[address]

RE: Employment Contract Termination

Dear Steve:

Per the terms of the Employment Contract dated March 13, 2000 between yourself and Manchester Gas Storage, Inc., specifically Section 10.1 B, this letter serves as your written notice of termination. The termination will be effective the later of a) June 17, 2001 or, b) the effective date of the Plan of Liquidation filed by Manchester Gas Storage, Inc. and MGL, Inc. in the Chapter 11 bankruptcy proceeding before the Court.

Best regards,

/s/ Steven A. Arnold

Steven A. Arnold

President

Manchester Gas Storage, Inc.

Arnold Exhibit 14 (the "Termination Letter"). Under the Employment Contract, termination compensation was payable to Arnold upon termination under sub-paragraph 10.1(B), but not in connection with termination under any other sub-paragraph of paragraph 10.1. Arnold did not inform Davis and DOC of the Termination Letter or that he had obligated the estate to pay termination compensation. Transcript at 37. Arnold did not cause the Debtors to seek Court approval before incurring the obligation to pay termination compensation nor was the obligation dis-

---

**4.** In the Stipulation, the parties erroneously refer to the proof of claim filed by Arnold on February 28, 2001 as Claim No. 31. Stipula-
tion at 7, ¶ 34. That proof of claim is identified as Claim No. 42 in the MGS claims docket.

closed in the Disclosure Statement or Plan, both of which were reviewed and signed by Arnold as representative of the Debtors. Arnold did not articulate any benefit to the Debtors and the estate resulting from termination under Section 10.1(B). After writing the Termination Letter, Arnold continued his employment by MGS and accepted salary and benefits consistent with the terms of the Employment Contract until July 23, 2001.

Beginning on August 15, 2001, Davis (unaware of the Termination Letter) retained Arnold on a non-exclusive contract basis for compensation of approximately $5,000 per month and provided Arnold with healthcare insurance on the same terms as provided under the Employment Contract. Transcript at 25–26. Under this arrangement, Davis (or his entities) paid Arnold $82,192.48 from August 15, 2001 through November 15, 2002. Davis Exhibit 6; Transcript at 26–27. Thereafter, from November 15, 2002 to March 31, 2003. Davis (or his entities) paid Arnold $18,461.97. Transcript at 31–33. In addition, in 2002 and 2003, Arnold was paid approximately $1,800 by the estate for services. Transcript at 5. On April 1, 2003. Arnold was retained by Zinke and Trumbo where he was employed at the time of the hearing, earning between $10,000 and $12,000 per month as a gas marketer. Transcript at 33.

On June 8, 2001, the Court entered an order approving Debtors' First Amended Disclosure Statement. Arnold Exhibit 16. The Disclosure Statement disclosed that Arnold would continue to serve as president of MGS and MGL until the appointment of a plan agent on the effective date of the Plan. Arnold Exhibit 15 at 13. The proposed plan was a liquidating plan in which a plan agent, who would have all the rights and powers of a trustee or debtor in possession under Section 1107 of the Bank-

ruptcy Code, would be appointed to administer the estate. Arnold Exhibit 15 at 25, ¶ IX(2). The Disclosure Statement contained two provisions regarding objections to claims. The article outlining the duties and powers of the plan agent and the article containing the General Provisions both provide—

> The Plan Agent shall have the standing and authority to object to Claims, as filed with the Court or scheduled by the Debtors, and to defend any counterclaims asserted in connection therewith, but must file all objections to Claims within 180 days of the Effective Date.

Arnold Exhibit 15 at 26–27, ¶¶ IX(2)(f) and XII(C). The Disclosure Statement further states that "[t]o the extent there are any inconsistencies between the Disclosure Statement and the Plan, the terms of the Plan govern." Arnold Exhibit 16 at 2.

On July 12, 2001, a confirmation hearing was held after which the Court entered its Order Confirming Debtors' Second Amended Plan of Reorganization. Arnold Exhibit 17. Jack E. Short (the "Plan Agent") was appointed as the plan agent. Arnold Exhibit 18. Consistent with the Disclosure Statement, the Plan provided that "the Plan Agent shall have all rights and powers of a trustee or debtor in possession under Section 1107 of the Code, and in accordance with Section 1123(b)(3)(B) of the Code, shall be designated by the Confirmation Order to serve as the representative of the Estates." Arnold Exhibit 17, Plan at 15, ¶ V(B)(2). Like the Disclosure Statement, the Plan also provided that "[t]he Plan Agent shall have the standing and authority to object to Claims, as filed with the Court or scheduled by the Debtors, and to defend any counterclaims asserted in connection therewith." The Plan, however, omitted the clause requiring the Plan Agent to file all objections to Claims within 180 days of

the Effective Date, and in fact did not establish a deadline for the Plan Agent, or anyone else, to object to claims. Arnold Exhibit 17, Plan at 15, ¶ V(B)(6).

The Plan did set a bar date for filing administrative claims at thirty days after the Effective Date, except that applications for compensation by professional persons were required to be filed no later than sixty days after the Effective Date. Arnold Exhibit 17. Plan at 9, ¶ II(B). Defined as the date eleven days after the entry of the confirmation order, July 23, 2001 became the Effective Date. Arnold Exhibit 17. Plan at 4. Consequently, the last day to file an administrative claim was August 22, 2001, although estate professionals had until September 21, 2001 to file their fee applications.

With respect to unassumed executory contracts, the Plan provided that "[a]ll executory contracts and unexpired leases of Debtors, for which a motion to assume is not filed prior to 60 days after the Effective Date, are rejected." Arnold Exhibit 17, Plan at 19. ¶ VII(A). Relevant to this dispute, no one ever filed a motion to assume or reject the Employment Contract or the December 14th Letter Agreement, either before or after the Effective Date.

The Plan set a deadline for filing rejection damage claims as follows—

Pursuant to the Confirmation Order and Bankruptcy Rule 3002(c)(4), and except as otherwise previously provided by other orders of the Court, proofs of claim for Claims arising from the rejection of an executory contract or unexpired lease shall be filed with the Court no later than the earlier of (i) the time provided under an order of the Court approving such rejection; (ii) the Bar Date [February 28, 2001], if applicable; or (iii) ninety (90) days after the Effective Date, or such Claim shall be forever barred.

Arnold Exhibit 17, Plan at 19–20, ¶ VII(B). The latest date to file a rejection damages claim under clause (iii) was October 22, 2001.[5]

On October 22, 2001, Arnold filed a second proof of claim for "[e]stimated executory contract rejection damages at no more than $100,000" (the "Second POC"). MGL Proof of Claim No. 31:[6] Arnold Exhibit 19. In a letter to the Plan Agent dated February 26, 2003. Arnold itemized the components of his rejection damages claim as follows: Termination pay of $60,000, 6 months of hospitalization, health, dental and life insurance premiums totaling approximately $4,000 (more precisely quantified at the hearing as $3,601.44) and prepetition unreimbursed business expenses of $3,549.77. Arnold Exhibit 24: Stipulation at 10–11, ¶¶ 53, 54, 55, 56.[7] Thus, Arnold seeks a total amount of $67,151.21 as rejection damages. Stipulation at 11, ¶ 57.

Between August 2001 and September 2002, the Plan Agent engaged in negotiations to resolve the majority of the outstanding claims against the Debtors which culminated in a settlement of several ad-

5. The ninetieth day, October 21, 2001, fell on a Sunday. Bankruptcy Rule 9006, which provisions are incorporated into the Plan, extends the time to act to the end of the next business day, in this case. October 22, 2001. *See* Fed. R. Bankr.P. 9006(a); Arnold Exhibit 17, Plan at 9, ¶ 1(B)(8).

6. In the Stipulation, the parties erroneously refer to the October 22, 2001 proof of claim as Claim No. 42. Stipulation at 10, ¶ 52. Arnold's second proof of claim is labeled Claim No. 31 in the MGL claims docket.

7. In the Second POC. Arnold also asserted an "employee bonus pool" claim in the amount of $7,350, but withdrew that component of his claim at the hearing.

versary proceedings between and among claimants to the remaining $21.5 million of proceeds from the sale of the Manchester Facility. Arnold Exhibit 22. The claimants had claimed an interest in the cushion gas that was sold with the facility or had claims for damages for fraudulent representations that gas they purchased was stored at the facility; their claims exceeded $200 million. *Id.* at 4–6.

On September 27, 2002, the Plan Agent filed a motion for approval of the compromise and settlement of disputes between and among the gas claimants, the secured lender and Davis[8] (the "Global Settlement"). Arnold Exhibit 22. After payment was made to the settling parties and to other unsecured creditors whose claims were not disputed, the Plan Agent was to "resolve the additional claims against the Debtors' estates and pay those claims that are allowed by the Court." *Id.* at 7, ¶ 15. "Any money or property held by Plan Agent after the payment of all costs of administration and all allowed claims shall be distributed to Davis, as sole shareholder of Debtors, pursuant to a further Order of this Court closing Debtors' bankruptcy cases." *Id.* On October 23, 2002, the Court entered its Order Approving the Global Settlement and granting the additional relief sought in the settlement motion. Arnold Exhibit 23. Neither the First POC or the Second POC were resolved by virtue of the Global Settlement.

From $40,059,888 of proceeds received by the Debtors from SPS (Stipulation at 7, ¶ 31), $18,578,008.06 was paid to the secured lender (Arnold Exhibit 15 at 17), $19,100,000 was paid to the settling litigants (Arnold Exhibit 22 at 6) and $1,236,422 was paid to other claimants (Arnold Exhibit 22 at 7), creating a "net gain" on the sale of the Manchester Facility (as that term is defined in the Employment Contract) of $1,142,458.

On April 30, 2003, counsel for the Plan Agent notified Davis, through his counsel, that the Plan Agent did not intend to file an objection to the First POC or the Second POC and that he planned to pay the claims on May 15, 2003, unless Davis filed an objection to the claims prior to that, date. Arnold Exhibit 25. On May 14, 2003, Davis filed an objection to the First POC and the Second POC. Arnold Exhibit 24.

Although Arnold did not assert the right to recover interest or attorney fees in either the First POC or Second POC, immediately prior to the hearing on Davis's objection, Arnold filed a brief asserting entitlement to postpetition interest on his claims as well as attorney fees expended in connection with the recovery of his claims. Memorandum of Law (Doc. 478).

The Plan Agent has sufficient funds to pay both the First POC and the Second POC in full. Stipulation at 12, ¶ 61. The Plan Agent testified that except for the paying the disputed Arnold claim, he has fully administered the estate, and that approximately $626,000 remains in the DIP accounts. Transcript at 6. Following the resolution of Davis's objection to Arnold's claims, these funds will first be applied to outstanding administrative expenses of less than $100,000, and then to satisfy the liquidated Arnold claims, if any: the remainder will be distributed to Davis. Transcript at 7. Davis, as sole shareholder, has already received equity distributions from the Plan Agent of approximately $750,000 in connection with the administra-

---

**8.** Approximately $3.2 million was distributed to Davis to reimburse him for the income tax liability he incurred as sole shareholder of the Debtors, which were subchapter S corporations, in connection with the sale of the Manchester Facility. Transcript at 7–8.

tion of Debtors' bankruptcy cases. Stipulation at 12, ¶ 61: Transcript at 7.

## III. Contentions of the parties

As a threshold matter, Arnold contends that Davis lacks standing to object to Arnold's claims, arguing that the confirmed Plan provides that only the Plan Agent has standing and authority to object to claims. Arnold's Response to Objection at 1–2.[9] Davis asserts standing under Section 502(a) of the Bankruptcy Code.

In his Objection, Davis sought disallowance of both of Arnold's proofs of claim in toto. At the hearing on August 28, 2003, however, Davis announced that he did not object to the signing bonus component ($11,220.00) of the First POC. In post-hearing briefing, Davis withdrew his objection to the allowance of the discretionary bonus ($25,000.00) and of the MGL trading bonus ($18,853.00). Davis's Post–Trial Brief at 3–4. Davis has also withdrawn his objection to the allowance and payment of the unreimbursed business expense component of the Second POC in the amount of $3,549.77. *Id.* at 6 and 43, n. 14. Thus, in active dispute are Arnold's claims for the MGS Sale of Business Bonus in the amount of $150,000.00, for rejection damages in the amount of $63,601.44 ($60,-000.00 in termination compensation and $3,601.44 in insurance benefits), and for an unliquidated amount of postpetition interest and attorney fees.

In connection with the MGS Sale of Business Bonus claim, Davis argues that the bonus was payable only if all MGS assets were sold in one transaction, and that MGS did not sell all its assets to SPS, but retained at least $1 million in other assets that were liquidated later. Davis also asserts that consideration for the modification of the Employment Contract by the December 14th Letter Agreement is lacking because Arnold had a pre-existing contractual duty to perform the services required to facilitate the sale of assets in exchange for his salary, and thus the promise to pay an additional $150,000 bonus for those services was gratuitous. Davis also contends that the December 14th Letter Agreement was not authorized by corporate resolution or executed by MGS's officers, formalities required under the Employment Contract, and therefore it is unenforceable. In addition, Davis contends that as an insider, Arnold is entitled to only "reasonable" compensation and that the $150,000 bonus is unreasonable for the service provided. Because under the terms of the Employment Contract, the bonus was to be calculated as a percentage of the net gain from the sale of all of MGS's assets. Davis contends that application of the percentage formula would produce a reasonable bonus.

With respect to Arnold's rejection damages claim, Davis first contends that rejection damages are not appropriate because the Employment Contract was not rejected but was instead terminated by virtue of Arnold's termination notice. Consequently, Davis argues that the claim for termination compensation is an unsecured prepetition claim, not a rejection damages claim, and therefore was not timely filed. Davis also argues that Arnold, as a fiduciary of the estate, should have terminated his employment pursuant to paragraph 10.1(F) of the Employment Contract, which provided for termination after a sale

---

9. Arnold initially asserted that the 180–day deadline to object to claims established by the Disclosure Statement had lapsed prior to the filing of Davis's objection and thus the objection was untimely. Arnold's Response to Objection at 2. However, in his post-trial brief, Arnold conceded that the confirmed Plan does not limit the time in which objections to claims may be filed. Arnold's Response to Post–Trial Brief at 6, n. 2.

of substantially all of the MGS's assets, which would have spared the estate Arnold's termination compensation claim. Davis also argues that if the Employment Contract was indeed rejected. Arnold suffered no damages because Davis and his companies continued to pay Arnold and provide him with benefits until Arnold obtained a position that paid more than he would have been paid under the Employment Contract. Finally, Davis again relies upon the Bankruptcy Code's "reasonableness" limitation on compensation of insiders to attack the termination compensation claim.

Davis objects to the allowance of postpetition interest on Arnold's claims and attorney fees because Arnold did not include such components in his proofs of claim and because the Plan does not provide for payment of interest or fees to unsecured creditors. Arnold contends that a solvent estate is required to pay interest to unsecured creditors prior to returning equity to shareholders.

## IV. Conclusions of law

### A. *Davis's standing to object to claims and timeliness of his objection*

■ Section 502(a) provides that any "party in interest" may object to a claim. 11 U.S.C. § 502(a). Section 1109(b) specifically includes equity security owners as "parties in interest" who are entitled to appear and be heard on any issue in a chapter 11 case. 11 U.S.C. § 1109(b). Thus, the Bankruptcy Code grants Davis status as a "party in interest" entitled to object to a claim. Moreover, as the sole equity owner of the Debtors, Davis is entitled to the residual estate after all claims are paid. The First POC and Second POC constitute the final unadjudicated claims against approximately $626,000 remaining in the estate. To extent that Arnold does not prevail on his claims, Davis will benefit. Davis has a direct pecuniary interest in the resolution of his objection and therefore a sufficient stake in the proceeding to meet the requirements for standing. *See, e.g., Nintendo Co. v. Patten (In re Alpex Computer Corp.),* 71 F.3d 353, 357 (10th Cir.1995) (party in interest must have "sufficient stake in the proceeding so as to require representation"), *quoting Vermejo Park Corp. v. Kaiser Coal Corp. (In re Kaiser Steel Corp.),* 998 F.2d 783, 788 (10th Cir.1993).

■ Arnold contends that the Plan granted standing to object to claims *solely* to the Plan Agent.

Article V(B)(6) of the Plan states—

The Plan Agent shall have the standing and authority to object to Claims, as filed with the Court or scheduled by the Debtors, and to defend any counterclaims asserted in connection therewith.

Arnold Exhibit 17, Plan at 15. The Plan grants the Plan Agent the right to object to claims but not the exclusive right.[10]

---

10. Arnold argues that the use of the article "the" before "standing" in Article V(B)(6) conferred exclusive authority upon the Plan Agent to object to claims and defend counterclaims against the estate. Arnold reasons that since the two actions (objecting to claims and defending counterclaims) are linked in the sentence, and defending counterclaims against the estate is not an activity other parties in interest are authorized to do under the Bankruptcy Code, then both activities must be within the exclusive purview of the Plan Agent. The conclusion is a non-sequitur, however. The Plan Agent may have exclusive authority to defend counterclaims under the Bankruptcy Code and the Plan, but the Bankruptcy Code provides *all parties in interest* an opportunity to object to claims. *See* 11 U.S.C. § 502(a). If the Debtors had intended Article V(B)(6) of the Plan to enjoin parties in interest from exercising their right to object to claims, notice to parties in interest that voting for the Plan would result in such an abridgement of rights was insufficient. *See* Fed. R.

The Court concludes that the Plan does not preclude other parties in interest from exercising the authority granted to them by Section 502(a) to object to claims.

### B. *Validity of claims*

 A properly filed proof of claim, that is, "one executed and filed in accordance with" the Bankruptcy Rules, "shall constitute *prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr.P. 3001(f): *see Agricredit Corp. v. Harrison (In re Harrison)*, 987 F.2d 677, 680 (10th Cir.1993). Such proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). The objecting party may challenge either the legal or the factual validity of the proof of claim. *Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*, 295 B.R. 140, 145 (10th Cir. BAP 2003). If the objecting party is challenging the factual basis for the claim, it must come forward with evidence contradicting the validity or amount of the claim "of probative force equal to" the evidence created by the proof of claim. *Broadband*, 295 B.R. at 145; *see also Agricredit*, 987 F.2d at 680.[11] "Once the objecting party has reached this threshold," the creditor assumes the ultimate burden of persuasion regarding the validity and the amount of its claim. *Id.*

### 1. *First POC: MGS Sale of Business Bonus*

 Davis first argues that Arnold is not entitled to the presumption that the First POC constitutes *prima facie* evidence of his claim because Arnold failed to "execute[ ] and file[ ]" the claim in accordance with the Bankruptcy Rules. Bankruptcy Rule 3001(c) states that "[w]hen a claim ... is based on a writing, the original or a duplicate shall be filed with the proof of claim." Fed. R. Bankr.P. 3001(c). Although Arnold contends that the December 14th Letter Agreement is the basis of his claim, that document was not attached to or filed with the First POC. The Court agrees that Arnold's proof of claim does not constitute *prima facie* evidence of the validity of his claim, and thus he had the burden of producing evidence to support his claim. Arnold submitted, and the Court admitted, the December 14th Letter Agreement. Regardless of whether the initial burden of coming forward with evidence fell upon Arnold or Davis, however, Arnold has the ultimate burden of persuading the Court to allow the claim.

### a. *Was the letter agreement supported by consideration?*

 Davis contends that the December 14th Letter Agreement modified the Employment Contract without consideration and is therefore unenforceable. In response, Arnold denies that the December 14th Letter Agreement modified the terms of the Employment Contract and argues that December 14th Letter Agreement merely liquidated the amounts already

Bankr.P.2002(c)(3) (if a plan proposes to enjoin conduct not otherwise enjoined by the Code, the notice of a confirmation hearing on the plan must advise of nature of the proposed injunction and the parties to be enjoined in conspicuous language (bold, italicized or underlined text)).

Nor is the fact that the Plan Agent chose not to object to Arnold's claims indicative of the merits of Arnold's claims or Davis's objection. Because Davis would be the sole beneficiary of the success of an objection to Arnold's claims, and more importantly, would be the party bearing the cost of prosecuting an objection, the Plan Agent acted rationally and prudently in yielding to Davis the decision to object to Arnold's claims.

11. Obviously, if only the legal effect of underpinnings of the claim are challenged based upon undisputed facts, burdens of going forward with the evidence are irrelevant.

promised to him under the Employment Contract. Thus, he argues, the original consideration provided to support the Employment Contract also supported the letter agreement. In the alternative, Arnold contends that to the extent the letter agreement constitutes a modification, the Employment Contract authorized the modification so no additional consideration was required. Finally, Arnold contends that if new consideration was required, it was provided.[12]

■■■ A cursory review of basic contract law will assist in framing the issues. Generally, the modification of an existing contract must be supported by new consideration flowing from the promisee to the promisor. *Robberson Steel Co. v. Harrell*, 177 F.2d 12, 15 (10th Cir.1949); *National Interstate Life Ins. Co. v. Thomas*, 1981 OK 71, 630 P.2d 779, 783; *Watt Plumbing, Air Conditioning and Electric Inc. v. Tulsa Rig, Reel & Manufacturing Co.*, 1975 OK 42, 533 P.2d 980, 983. Under Oklahoma law, consideration is defined as—

Any benefit conferred, or agreed to be conferred upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.

15 O.S. § 106. In layman's terms, the authors of Williston on Contracts define consideration as a "bargained-for exchange," that is, "the exchange or price requested and received by the promisor for his promise." Williston on Contracts § 7.2 (Modern Meanings of Consideration). Particularly relevant to this case is the principle that "past consideration" value given to the promisor by promisee prior to (and therefore not in exchange for) the promise is not valid consideration. *See, e.g., In re Estate of Lovekamp*, 2001 OK CIV APP 71, 24 P.3d 894, 896; *Intercon Manufacturing, Inc. v. Centrifugal Casting Machine Co.*, 1993 OK CIV APP 143, 875 P.2d 1149, 1153.[13] Further, promising the future performance of something one is already obligated to do cannot support a reciprocal new promise either (the "pre-existing duty" rule). *Home Owners' Loan Corp. v. Thornburgh*, 1940 OK 424, 106

---

**12.** Arnold also argues that by withdrawing his objection to the other three bonuses provided for in the December 14th Letter Agreement. Davis has conceded that no additional consideration was required to support the December 14th Letter Agreement, or, in the alternative, that consideration was provided. Arnold's Response to Post–Trial Brief at 7–8. Davis, however, has conceded to no such thing. Davis merely withdrew his objection to the allowance of three of the four bonus components, choosing, for whatever reason, to allow them to be paid from his equity, which he may do without prejudicing his position that the December 14th Letter Agreement lacked consideration.

**13.** In both *Lovekamp* and *Intercon*, the appellate court quotes *Kennedy v. Marshall*, 1945 OK 213, 160 P.2d 397, 398–99, as follows—

By the great weight of authority a past consideration, if it imposed no legal obligation at the time it was furnished, will support no promise whatever; or, as the rule has been stated otherwise, an executed consideration is no consideration for any promise other than that which the law would imply. A past consideration, it is said, is some act or forbearance in time past by which a man has benefited without thereby incurring any legal liability; if afterward, whether from good feeling or from interested motives, he makes a promise to the person by whose act or forbearance he has benefited, and that promise is made on no other consideration than the past benefit, it is gratuitous and cannot be enforced; it is based on motive and not on consideration.

*Lovekamp*, 24 P.3d at 896; *Intercon*, 875 P.2d at 1153.

P.2d 511, 512 ("performance or promise of performance of a duty ...which one is already legally bound to do, forbear or suffer, is not a sufficient consideration to support a contract").[14]

■ The authors/editors of Williston on Contracts devote an entire subsection of their chapter on "Consideration" to the application of the pre-existing duty rule to a "[p]romise to pay bonus, pension, or other benefit." Williston on Contracts § 7:38 (Promise to Pay Bonus, Pension, or Other Benefit).

> Insofar as the contractual pre-existing duty rule is concerned, it may have special application to a bonus promised to an employee. In such a case, the bonus may be a promise of a true gift on condition or a contractual obligation. Thus, it may consist of a simple contract of employment at an agreed wage and the promise of a further sum or "bonus" either measured by the earnings of the business, or as a fixed sum. On the other hand, it may fall within the general subject under discussion, a promise of an incentive to encourage the employee to perform in accordance with his previously existing contract of employment. If that is the case, it logically stands in no better position than the contracts discussed in the preceding sections [*i.e.*, contracts lacking consideration due to a pre-existing duty to perform].
>
> Under the traditional view, ... a promise to pay a bonus is unenforceable for want of sufficient consideration, since the employee is only giving the same service he has already contracted with the employer to render. On the other hand, if the purpose and effect of the executory promise of a bonus is to induce the employee to refrain from exercising his liberty of quitting and, in reliance on the promise he does refrain for the period specified, there is sufficient consideration to render the promise enforceable ...; and modern courts seem much inclined to construe promised bonuses in this manner, rather than to assume that the employer intended no more than a gratuitous, illusory promise....
>
> It should be noted that even under the more liberal approach of the Restatement (Second) [of Contracts], a promised bonus, unless it is construed as seeking the employee's continuation on the job as consideration, will often fare no better than under the traditional view.... [I]f there is a statute regulating the matter or sufficient reliance on

---

**14.** Neither party cited the case of *McGraw v. Bill Hodges Truck Co.*, 1981 OK CIV APP 13, 629 P.2d 792, *cert. denied*, perhaps because it is wholly unpersuasive in that its reasoning flies in the face of established contract law. The panel (with one judge dissenting) singled out an employer's promise of a bonus as a promise exempt from the usual restrictions of the pre-existing duty rule, stating that a "body of common law somewhat indigenous to employment bonuses has developed, thus eliminating the necessity of our having to spend time structuring the decision in this case on fundamentals of contract law." *Id.*, 629 P.2d at 794.

After citing one case for the proposition that granting a bonus was not an "ultra vires act," a concept of corporate law unrelated to the concept of consideration in contract law, the Court declared, curiously, that "[i]n this case justice requires enforcement of [the employer's] promise to pay the $7,000 bonus to plaintiff." *Id.*

This Court is not required to adhere to decisions of the Oklahoma Court of Appeals, and the Court is at a loss as to how to reconcile the reasoning or result of the *McGraw* case with strongly rooted principles of contract law. *See* 20 O.S. § 30.5 (Oklahoma Court of Civil Appeals opinions have no precedential value unless approved for publication by the Oklahoma Supreme Court); *Russell v. Atlas Van Lines, Inc.*, 411 F.Supp. 111, 113 (E.D.Okla.1976). Publication of the *McGraw* decision was not approved for publication by the Oklahoma Supreme Court.

the part of the employee, then the modified agreement would be enforceable. But otherwise, absent a finding of some additional consideration, the promise of a bonus is likely to run into the contractual pre-existing duty rule.

Willison on Contracts § 7:38. Thus, the promise of a bonus conditioned upon the *future* satisfaction of certain requirements (*i.e.,* providing services for a fixed period of time) or achievement of certain goals (*i.e.,* sales or profits) is enforceable upon the fulfillment of the conditions, the consideration being the performance by the promisee. When an initial contract for employment specifically provides for the award of a defined bonus, that promise of a future bonus is supported by the employee's original agreement to accept the employment, as the bargain struck is for services in exchange for a compensation package comprised of a salary *and* the bonus. The employer's subsequent promise of a more generous bonus is not supported by the original consideration, however, because the employee has already reciprocally promised to perform as an employee in exchange for the original, less generous bonus.

To determine whether the December 14th Letter Agreement modified the Employment Contract or merely liquidated the bonuses already promised by MGS and earned by Arnold, the Court must scrutinize the relevant contractual language. The Employment Contract entitled Arnold to receive the MGS Sale of Business Bonus only if (1) all assets of MGS were sold and (2) the transaction arose on or after April 1, 2002, in which case the amount of the bonus was to be calculated using a formula that required, first, that all MGS liabilities be paid in order to determine the amount of "net gain" and then, the application of a certain percentage to the net gain, which percentage varied according to the year of the sale. Arnold Exhibit 2 at 5–6, ¶ 5.6(A).

The Employment Contract specifically provided, however, that (1) MGS (acting through Davis) was not "limited" by the terms of the contract from waiving the time restriction so that a bonus might become payable to Arnold if a sale occurred *prior* to April 1, 2002 (Arnold Exhibit 2 at 6, ¶ 5.6(F)) and (2) the parties, by mutual agreement, could modify the "applicable percentages used to calculate . . . the MGS Sale of Business Bonus . . . to reflect unanticipated changes in the corporate structure of the Company which could occur from time to time" (Arnold Exhibit 2 at 6, ¶ 5.7).

Arnold contends that no new consideration was required to support MGS's waiver of the requirement that the sale transaction arise on or after April 1, 2002 in order for Arnold to qualify for the MGS Sale of Business Bonus. The Employment Contract specifically provided that "[n]othing contained herein shall limit MGS, in [Davis's] sole discretion, from waiving the time restriction in which ARNOLD becomes eligible to receive the MGS Sale of Business Bonus, if any." Arnold Exhibit 2 at 6. ¶ 5.6(F). Davis argues that this provision merely acknowledges that MGS and Davis were not *prohibited* from waiving the time restriction but does not constitute acquiescence by MGS that such a waiver may be given without receiving something from Arnold in return. The Court finds, however, that the contract allows Davis discretion to choose not only *whether* to waive the time restriction but also the terms of the waiver: otherwise the provision would be superfluous, since parties can always modify a contract provision, such as the time restriction, with consideration. In the December 14th Letter Agreement, Davis exercised his discretion to waive the time restriction without demanding any additional consideration. The discretion granted to Davis by para-

graph 5.6(F) was limited, however, to the waiver of the time restriction: it did not grant Davis unlimited discretion to agree to alter the other terms of the bonus provision without consideration.

However, the Employment Contract expressly permitted modification of "the applicable percentages used to calculate ... the MGS Sale of Business Bonus ... to reflect unanticipated changes in the corporate structure of the Company which could occur from time to time." Arnold Exhibit 2 at 6. ¶ 5.7. Since the flexibility to alter the percentages to reflect unanticipated changes in corporate structure was part of the package of promises that induced Arnold to enter into the employment relationship, the original consideration given by Arnold for MGS's performance of the Employment Contract (the agreement to perform services exclusively for the Companies) is sufficient to support any modification authorized by paragraph 5.7. Modifications other than to the percentages, or for reasons other than unanticipated changes in corporate structure, however, were not bargained for in the negotiation of the Employment Contract, and therefore modifications outside the scope of those authorized by paragraph 5.7 require an exchange of consideration. In such a case. Arnold would have to "purchase" a modification beneficial to him either by providing an extra benefit to MGS or by assuming a detriment that he was not already required to suffer under the original contract terms. *See, e.g., Robberson Steel Co.,* 177 F.2d at 15.

The Court concludes that the modification of the eligibility requirements and method of calculating the MGS Sale of

Business Bonus, as stated in the December 14th Letter Agreement, exceeds the scope of modifications authorized by paragraph 5.7 of the Employment Contract. The promise to pay a bonus of $150,000 regardless of the ultimate net gain did not merely adjust the "applicable percentages used to calculate" a potential bonus; it established a flat fee without regard to whether the sale was profitable to MGS. Nor had any "unanticipated changes in the corporate structure" occurred. In addition, under the Employment Contract, Arnold would become eligible for the MGS Sale of Business Bonus "[u]pon sale of MGS, or upon sale of all of the assets of MGS." Arnold Exhibit 2 at 5, ¶ 5.6(A). As of the December 14th Letter Agreement, neither of these events had occurred (notwithstanding the recitation in the letter agreement that the "sale of MGS and MGL to Salt Plains Storage ... is now complete"), nor did they occur thereafter. Thus, the letter agreement modified that provision as well.

The Court finds that the modifications contained in the letter agreement were not of the genre of modifications authorized by paragraph 5.7. Thus, the parties agreement to modify (1) the terms under which Arnold was entitled to the MGS Sale of Business Bonus (*i.e.,* before any sale transaction had been consummated and in connection with a sale of less than all MGS assets) and (2) the method of calculating the amount of the bonus (from a percentage of net gain to a sum of $150,000 regardless of net gain) is enforceable only if supported by consideration.[15]

Arnold argues that if new consideration was required, "the fact that the letter agreement was in writing results in pre-

---

15. Paragraph 12.6 of the Employment Contract also directs that no modification to the terms of the contract is binding unless "reduced to writing, approved by resolution of the Board of Directors of Company, and signed by ARNOLD and the duly authorized officers of Company." Arnold Exhibit 2 at 13, ¶ 12.6. Arnold did not establish compliance with paragraph 12.6, either.

sumptive evidence of a consideration." Arnold's Consideration Memorandum at 4, citing 15 O.S. § 114 ("[a] written instrument is presumptive evidence of a consideration."). Indeed, that presumption shifted the burden of proof to Davis to show a lack of consideration for the promise to pay the MGS Sale of Business Bonus. 15 O.S. § 115.[16] In the Consideration Memorandum, Arnold contends that his continued employment provided new consideration for the promise of the $150,000 MGS Sale of Business Bonus because "Davis' companies needed to ensure that Arnold would stay on as an employee and supervise the post-bankruptcy sale and reorganization efforts contemplated by the asset purchase agreement." Consideration Memorandum at 4. The evidence, however, contradicts this contention. Arnold testified as follows—

> Q. [by Mr. Howland].... Now there's been some talk about you agreeing to do work after December 14 and staying on with the company. I would like you to turn to Exhibit Number 4, which is this December 14, 2000 agreement, letter agreement.
> A. [by Mr. Arnold]. Yes.
> Q. And can you point to anything in this contract that obliges you, obligates you to do any further work for the company?
> A. No. I don't think that was the intent.
> Q. As a matter of fact, it was your intent, if—I'm going to read from the stipulation, paragraph 24. "Arnold's in-

terpretation of the December 14, 2000 letter agreement is that as of that date he was fully entitled to all of the enumerated bonus payments recited in that letter agreement including the sale-of-business bonus without regard to whether the sale of the Manchester Gas Storage Facility was subsequently consummated." . . .

> \* \* \* \* \* \*

> Q. That's what you thought was the case?

> A. Yes.

Transcript at 85–86.[17] Not only was this what Arnold thought, but also it is what a reasonable reading of the letter agreement provides. The letter agreement contains no requirement that Arnold continue his employment with MGS in order to be eligible for the MGS Sale of Business Bonus.

▌ Arnold further argues that if consideration was required, section 107 of title 15 of the Oklahoma Statutes supports the view that MGS and Davis had a "legal and moral obligation" to comply with the promises made in the December 14th Letter Agreement. Consideration Memorandum at 3–4. The cited statute states—

> An existing legal obligation resting upon the promisor, or a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also a good consideration for a promise, to an extent corre-

---

16. "The burden of showing a want of consideration sufficient to support an instrument lies with the party seeking to invalidate or avoid it." 15 O.S. § 115.

17. The Court recognizes that Davis also acknowledged that he did desire Arnold to "stay onboard to help consummate the contemplated sale transaction through a bankruptcy" and that "Arnold was willing to do that."

Transcript at 48. However, Arnold himself denied that he agreed to continue employment as a *quid pro quo* for the December 14th Letter Agreement. Moreover, the letter agreement did not make continuation of employment a condition of receiving any of the bonuses, and no one testified that such a condition existed.

sponding with the extent of the obligation, but no further or otherwise.

15 O.S. § 107.

This statute codifies the quasi-contractual principles of promissory estoppel and unjust enrichment. Arnold has not established the cardinal elements of promissory estoppel—detrimental reliance on the promise of a bonus of $150,000—or of unjust enrichment—an uncompensated benefit conferred by Arnold to MGS. In particular, Arnold testified he believed at the time of the December 14th Letter Agreement that he had already earned the bonus; he did not take any action thereafter to his detriment (*i.e.*, forego other opportunities) in reliance of the promise of the bonus. Stipulation at 5, ¶ 24. Further, Arnold did not establish that he conferred a benefit on MGS that he wasn't already obligated to confer. Stipulation at 5, ¶ 20 (the work Arnold performed in connection with the sale of MGS were duties he was otherwise obligated to perform under the Employment Contract). The statute permits enforcement of the promise only to the extent of the benefit conferred on MGS, as promisor (to prevent unjust enrichment), or to the extent of the prejudice suffered by Arnold, as promisee, in reliance on the promise (promissory estoppel), and no more. To enforce a promise of a bonus of $150,000 under this theory, Arnold would have to show that he conferred a benefit of $150,000 on MGS or that he suffered a detriment in the amount of $150,000. Arnold did not quantify any amount by which MGS was unjustly enriched nor any amount of specific detriment suffered by himself in reliance on the promise of a $150,000 bonus in order to establish the "extent" of the species of

consideration recognized by section 107 of title 15.[18]

Other forms of potential consideration also fail. Arnold stipulated that he considered all liquidated amounts to be due and owing as of December 14, 2000, as compensation for *past* services. Stipulation at 5, ¶ 24; Transcript at 72. As set forth above, under basic contract law, "past consideration" is not valid consideration. Arnold did not promise any future services in exchange for the modification of the terms of eligibility for the MGS Sale of Business Bonus. The bonus was not intended, nor did it serve, to induce Arnold to remain employed by MGS. Transcript at 85. Although Arnold did remain employed by MGS through July 23, 2001, he had a pre-existing duty under the Employment Contract, if he desired to continue to receive a salary and benefits set forth therein, to perform the services that he performed. And MGS did in fact pay Arnold in full the salary and benefits he earned by performing those services. Transcript at 76.

Thus, the Court concludes that MGS's promise to pay Arnold an MGS Sale of Business Bonus in the amount of $150,000, as set forth in the December 14th Letter Agreement, was not supported by valid consideration and is not enforceable against MGS.

> b. *Is the amount of the MGS Sale of Business Bonus unreasonable?*

In addition to asserting that consideration was missing from the December 14th Letter Agreement bargain, Davis, citing Section 502(b)(4) of the Bankruptcy Code,

---

**18.** Arnold also argues that MGS had a pre-existing legal obligation to pay the bonus. To the extent that MGS had a pre-existing legal (contractual) obligation to pay a bonus, it was limited to a percentage of net gain after the completion of a sale of MGS or all its assets. Thus, such consideration is good only to the extent of that obligation, it is not sufficient to support a promise of a bonus in the amount of $150,000.

argues that as an insider, Arnold's claim for compensation is limited by a reasonableness standard, and that his claim for the MGS Sale of Business Bonus in the amount of $150,000 is unreasonable. Arnold denies that the claim is unreasonable and contends that Davis is estopped from challenging its reasonableness because Davis suggested the amount and promised that MGS would pay it.

Section 502(b) provides, in relevant part, that—

> [If an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount except to the extent that—
>
> \* \* \* \* \* \*
>
> (4) if such claim is for services of an insider ... of the debtor, such claim exceeds the reasonable value of such services[.]

11 U.S.C. § 502(b)(4). Because the Court has found that the MGS Sale of Business Bonus claim must be disallowed pursuant to Section 502(b)(1) ("such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured"), the Court need not assess the reasonableness of the claim under Section 502(b)(4).

### c. Allowance of the undisputed components of the First POC.

In light of the withdrawal of Davis's objection to the signing bonus in the amount of $11,220, the discretionary bonus in the amount of $25,000, and the MGL trading bonus in the amount of $18,853, the First POC is allowed in the amount of $55,073.

### 2. Second POC—claim for damages arising from rejection of executory contract

 Davis contests allowance of the Second POC insofar as Arnold claims $60,000 in termination compensation and $3,601.44 for six months of insurance benefits. The issues are whether the claims are truly rejection damages claims or something else, and if they are rejection damages claims, whether Arnold has properly measured the damages and whether damages have been mitigated by subsequent earnings or other compensation.

Again, Arnold failed to attach to his proof of claim the key supporting documents underlying his claim (the Employment Contract and the Termination Letter) and thus is not entitled to the presumption that the Second POC is *prima facie* evidence of his claim. Fed. R. Bankr.P. 3001(c) and (f). These documents were introduced and admitted into evidence at the hearing, however, Davis has countered with legal arguments challenging the character and timeliness of the claim and evidence of Arnold's earnings since the alleged rejection of his Employment Contract as proof of an absence of damages. It is, again, Arnold's burden, ultimately, to persuade the Court that he incurred damages "arising from the rejection of an executory contract."

### a. Whether the Second POC was timely filed depends upon whether the Employment Contract was rejected or terminated.

 The Plan provided that "[a]ll executory contracts and unexpired leases of Debtors, for which a motion to assume is not filed prior to 60 days after the Effective Date, are rejected." Arnold Exhibit

17, Plan at 19, ¶ VII(A).[19] All claims "arising from the rejection of an executory contract" had to be filed "no later than ... ninety (90) days after the Effective Date, or such Claim shall be forever barred." Arnold Exhibit 17, Plan at 19–20, ¶ VII(B). Arnold filed his Second POC on the ninety-first day after the Effective Date, which, if the claim is a rejection damages claim, was timely filed according to the terms of the Plan, since the ninetieth day was a Sunday.

Arnold's claims flow from the purported *termination* of the Employment Contract by virtue of the Termination Letter, however. Under the Employment Contract, MGS was obligated to pay a lump-sum termination payment if the contract was terminated by MGS "upon thirty (30) days' prior written notice by MGS to AR-NOLD." Arnold Exhibit 2 at 11, ¶ 10.1(B). In the Termination Letter, Arnold invoked paragraph 10.1(B) to terminate the contract effective as of the Effective Date.

■■■■ A terminated contract is no longer an *executory* contract and therefore it is not susceptible to being rejected. *See, e.g., Gloria Manufacturing Corp. v. Int'l Ladies' Garment Workers' Union,* 734 F.2d 1020, 1022 (4th Cir.1984) ("[o]nce a contract has expired on its own terms, there is nothing left for the trustee to reject or assume"). Moreover, termination of a contract by a debtor is not itself an act of rejection. *See, e.g., In re North American Royalties, Inc.,* 276 B.R. 860, 865–66 (Bankr.E.D.Tenn.2002) (a debtor may terminate a contract without assuming or rejecting it if the contract specifically permits termination). And re-

jection of a contract by a debtor does not entitle the other party to recover contractual liquidated damages that are conditioned upon *termination. See Foothill Capital Corp. v. Official Unsecured Creditors' Committee of Midcom Communications, Inc.,* 246 B.R. 296, 301–02 (E.D.Mich.2000) (rejection of contract did not entitle lender to early termination premium, *citing First Sec. Bank of Utah, N.A. v. Gillman,* 158 B.R. 498, 504 (D.Utah 1993)); *In re Child World, Inc.,* 161 B.R. 349 (Bankr.S.D.N.Y.1993) (rejection of a contract is not a termination of the contract).

■■■■ Termination of an executory contract that is property of the estate must be approved by the Court if termination is outside the ordinary course of the debtor's business. *See* 11 U.S.C. § 363(b)(1); *In re Roth American, Inc.,* 975 F.2d 949, 952–54 (3d Cir.1992) (amending collective bargaining agreement required approval under Section 363); *North American Royalties, Inc.,* 276 B.R. at 866 (termination of an executory contract is disposition of property of the estate requiring court approval). When the representative of the debtor in possession, a fiduciary,[20] invokes a provision in an employment contract favorable to himself and unfavorable to the estate, the insider transaction should at the very least be disclosed to the creditors and the Court for scrutiny. *See, e.g., Bernstein v. Donaldson (In re Insulfoams, Inc.),* 184 B.R. 694, 703 (Bankr.W.D.Pa.1995), *aff'd* 104 F.3d 547 (3d Cir.1997). Arnold did not disclose that he, acting as representative of MGS, intended to terminate the Employ-

---

**19.** MGS did not file a motion to assume the Employment Contract.

**20.** *See Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (representatives of debtor in possession have same fiduciary obli-

gation toward creditors and shareholders as a trustee), *citing Wolf v. Weinstein,* 372 U.S. 633, 649–52, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963); *In re Americana Expressways, Inc.,* 133 F.3d 752, 756 (10th Cir.1997).

ment Contract pursuant to paragraph 10.1(B) and saddle the estate with a new liability for his personal benefit in the amount of $60,000 plus benefits, instead of terminating his employment pursuant to paragraph 10.1(F), which entitled MGS to terminate the contract upon "sale of all or substantially all of the MGS' [sic] assets to a single purchaser or group of associated purchasers" without incurring an obligation to pay termination compensation. Arnold Exhibit 2 at 12, ¶ 10.1(F)(1). Creditors, including Davis, were entitled to notice and an opportunity to be heard as to whether MGS's termination of the Employment Contract under paragraph 10.1(B) had a sound business purpose and was in the best interests of the estate. This was no ordinary course transaction. *See, e.g., Dalton Development Project # 1 v. Unsecured Creditors Committee (In re Unioil)*, 948 F.2d 678 (10th Cir.1991) (transfers of property of estate executed by debtor's officer to affiliates owned, in part, by such officer were outside ordinary course of business and required approval). Transactions requiring, but lacking, approval may be set aside as void. *Id.* at 682–83.[21]

▮ If the Employment Contract had been properly terminated pursuant to paragraph 10.1(B), the Court would have to conclude that the Second POC was untimely. The termination compensation (liquidated damages) sought by Arnold arises from the *termination* of the contract, not from the rejection of the contract. The claim for termination compensation might be an administrative claim under Section 503(b) of the Bankruptcy Code or a prepetition unsecured claim, but it is not a rejection damages claim.[22] The bar date for filing prepetition claims was February 28, 2001. The bar date for filing administrative claims was thirty days after

---

**21.** Arnold alternatively contends that "submission of the Plan calling for rejection of Arnold's employment contract (as an executory contract) *also involved* a 30–day written notice to Arnold that his employment would be terminated." Arnold's Response to Post–Trial Brief at 19 (emphasis original). Arnold thus argues that the Plan itself invoked paragraph 10.1(B), triggering MGS's obligation to pay termination compensation to Arnold. Again, rejection of a contract is not termination, and the Plan merely rejected all unassumed executory contracts.

Arnold also asserts that "[t]ermination of the Employment Contract also resulted from the rejection and resulting 'breach' contemplated by 11 U.S.C. § 365(g). See Section 10.1(E) of the Employment Contract." Arnold's Response to Post–Trial Brief at 19. n. 18. Even if the rejection's "breach" did cause a termination of the contract under paragraph 10.1(E), however, such a termination did not compel the payment of termination compensation—only termination under paragraph 10.1(B) was capable of producing that result.

**22.** Claims for termination compensation (severance pay) arising from the postpetition termination of unassumed prepetition employ-

ment contracts often draw objections as to their priority. For instance, in *Bachman v. Commercial Financial Services, Inc. (In re Commercial Financial Services, Inc.)*, 246 F.3d 1291 (10th Cir.2001), the issue was whether a claimant seeking severance pay promised by the debtor in a prepetition employment contract was entitled, after being terminated postpetition, to recover the full amount of severance pay as an administrative priority claim. The Court held that the former employee's claim was not entitled to administrative priority because the *estate* had not made the bargain with the employee to begin employment in exchange for the promise of severance pay and thus did not receive any benefit in exchange for the severance pay. *Id.* at 1294–95.

In this case, it is not necessary to determine whether Arnold's claim for termination compensation is a prepetition claim (which would entitled him to a *pro rata* share of the estate) or an administrative claim (which would entitle him to payment in full). In either case, if Arnold were to prevail, his claim would be paid in full because the estate is solvent.

the Effective Date. Arnold Exhibit 17, Plan at 9, ¶ II(B). The last day to file an administrative claim was August 22, 2001 (although estate professionals had until September 21, 2001 to file their fee applications). Arnold filed his Second POC on October 22, 2001.

The Court concludes, however, that Arnold's attempt to terminate the Employment Contract under paragraph 10.1(B) without notice to creditors or approval by the Court was ineffective. Therefore the still viable Employment Contract was rejected as of the Effective Date of the Plan.

[22] As a rejection damages claim, the Second POC was timely, but as such Arnold is entitled to recover rejection damages for breach of the Employment Contract, not termination compensation. *See Foothill Capital Corp.*, 246 B.R. at 302 (rejection constitutes a breach rather than a termination of the contract); 11 U.S.C. § 365(g).[23] Rejection damages are measured under traditional state contract law and such damages are subject to mitigation. *See Landsing Diversified Properties–II v. First National Bank and Trust Co. (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 595 (10th Cir.1990); *Child World, Inc.*, 161 B.R. at 352–53. Arnold has the burden of proving damages for MGS's breach of the Employment Contract.

The only evidence of such damages was introduced by Davis or elicited from Arnold on cross-examination by Davis. With respect to Arnold's claim for the value of six months of insurance benefits. Davis or DOC paid Arnold's insurance benefits after the confirmation of the Plan on the same basis as provided for in the Employment Contract. Transcript at 25–26. Thus, Arnold has not met his burden of proving that he suffered a loss of insurance benefits as a result of the rejection.

■ Davis employed Arnold as a contractor following the confirmation of the Plan. From the Effective Date until March 31, 2003, Arnold was paid $100,643 by Davis (or his entities). Davis Exhibit 7 and Transcript at 26–27 and 31–33. On April 1, 2003, Arnold secured a full time position with a third party, earning $10–12,000 per month, an amount that exceeds the salary he would have been paid under the Employment Contract by $2,000 to $4,500 per month. In addition, in 2002 and 2003, Arnold earned $1,800 by performing contract work for the estate. The Court finds and concludes that Arnold failed to prove that he suffered any damages as a result of the rejection of the Employment Contract. *See, e.g., Child World*, 161 B.R. at 352 (where lessor benefited from rejection of lease by letting premises at a higher rental rate than charged in rejected lease, lessor incurred no rejection damages).

Accordingly, Davis's objection to the Second POC is sustained and the claim is disallowed except to the extent of the unopposed claim for unreimbursed busi-

---

**23.** Some courts hold that rejection of a contract rejects, and thus prevents enforcement of, a burdensome liquidated damages clause. *See, e.g., In re EI International*, 123 B.R. 64 (Bankr.D.Idaho 1991); *In re TransAmerican Natural Gas Corp.*, 79 B.R. 663, 667 (Bankr. S.D.Tex.1987). This reasoning has been criticized as erroneously treating the contract as "terminated" rather than breached. *See In re Independent American Real Estate, Inc.*, 146 B.R. 546, 553 n. 6 (Bankr.N.D.Tex.1992).

The Court need not determine whether rejection of the Employment Contract rendered the termination compensation provision unenforceable, however, since such compensation was payable only upon termination of the contract pursuant to paragraph 10.1(B), and not otherwise, and the Court has found that any purported termination pursuant to paragraph 10.1(B) was void.

ness expenses in the amount of $3,549.77, which is allowed.

### 3. Post-petition interest and attorney fees

■ In the Interest and Attorney Fee Memorandum filed the day before the hearing. Arnold asserted for the first time a claim for postpetition interest and attorney fees. Arnold claims that because the estate is solvent, he is entitled to recover postpetition interest on his claims and attorney fees he incurred in establishing his claims before any surplus is returned to Davis as equity owner. Davis contends that because the Plan does not provide for payment of postpetition interest or fees to unsecured creditors and because Arnold accepted the Plan, he is bound by the terms of the confirmed Plan and is therefore precluded from seeking or recovering postpetition interest or fees.

The confirmed Plan is binding upon the parties. *See* 11 U.S.C. § 1141(a); *Behles–Giddens, P.A. v. Raft (In re K.D. Co.)*, 254 B.R. 480, 489 (10th Cir. BAP 2000) (confirmed plan is binding even if its provisions conflict with the Bankruptcy Code). Under the Plan, Arnold's claims, as unsecured prepetition claims, are Class 4 Claims and are treated as follows—

> The Class 4 Claims are impaired. Class 4 Claims shall be paid Pro Rata from the proceeds of the sale of Assets remaining after the payment of Administrative Claims, Tax Claims. Class 1 [Priority Claims], 2 [Secured Claims] and 3 [Allowed Unsecured Claims under $10,000] Claims and Plan Costs.

Arnold Exhibit 17, Plan at 13, ¶ IV(D). Davis's equity interest is a Class 5 Interest, for which the Plan provides—

> Class 5 Interests are impaired under the Plan. Class 5 Interests shall receive a distribution after the payment of all Ad-

ministrative Claims, Tax Claims, Class 1, 2, 3 and 4 Claims and Plan Costs.

Arnold Exhibit 17, Plan at 13, ¶ IV(E).

■ Both parties recognize that the general rule in bankruptcy is that creditors are not entitled to payment of postpetition interest on claims except as provided in the Bankruptcy Code. The general rule is codified in Section 502(b) of the Bankruptcy Code which provides that the amount of a claim shall be determined as of the date of the filing of the petition. 11 U.S.C. § 502(b). For good measure, the statute also forbids allowance of a claim for "unmatured interest," that is, interest accruing *after* the date of the filing of the petition. 11 U.S.C. § 502(b)(2); *see also Tuttle v. United States (In re Tuttle)*, 291 F.3d 1238, 1241 (10th Cir.2002); *United States v. Victor*, 121 F.3d 1383, 1387 (10th Cir.1997) ("Section 502(b) does not simply prohibit certain creditors from filing a proof of claim for postpetition interest; it prohibits those creditors from collecting the interest from the bankruptcy estate.")

■ The Bankruptcy Code itself establishes only two exceptions to Section 502(b)'s prohibition of the allowance of postpetition interest. In any chapter, if a secured creditor is oversecured, and to the extent it is oversecured, the creditor is entitled to "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). In a chapter 7 case, the estate is distributed according to priorities set forth in Section 726 of the Bankruptcy Code, and an unsecured claimant may be entitled to postpetition interest if a surplus exists after all claims of a higher priority are paid in full. 11 U.S.C. § 726(a)(5). Section 726 requires payment of postpetition interest to unsecured claims before any non-exempt

estate assets may be returned to the chapter 7 debtor.[24]

▪▪▪ There is no statutory exception to Section 502(b) that mandates or even *allows* postpetition interest to be paid by the estate to creditors other than oversecured creditors under Section 506(b) in a chapter 11 case, however. Parties may consent to a plan containing a provision for payment of postpetition interest, however.

Some courts have held that the "best interests of creditors" test that must be satisfied as a prerequisite to confirmation of a plan, which requires the plan to provide dissenting creditors distributions in amounts not less than they would receive in a chapter 7 liquidation (codified in Section 1129(a)(7)), indicates that postpetition interest on unsecured claims *must* be paid if the debtor is solvent, that is, if its assets exceed its liabilities. *See, e.g., In re Dow Corning Corp.,* 237 B.R. 380, 384–85 (Bankr.E.D.Mich.1999) (in dicta, as parties agreed that plan of solvent estate had to provide for postpetition interest on unsecured claims; disputed issue was the rate of interest); *In re Schoeneberg,* 156 B.R. 963, 969–70 (Bankr.W.D.Tex.1993). *Cf. In re Shaffer Furniture Co.,* 68 B.R. 827 (Bankr.E.D.Pa.1987) (court held that Section 1129(a)(3)'s requirement of "good faith" compelled that plan of a misbehaving but solvent debtor provide for payment of postpetition interest to unsecured creditors). Section 1129(a)(7) provides that the court shall confirm the plan only if—

[w]ith respect to each class—

(A) each holder of a claim ... of such class—

(i) has accepted the plan; *or*

(ii) will receive ... under the plan on account of such claim ... property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive ... if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7) (emphasis added).

▪▪▪ If a creditor *objects* to the confirmation of a plan because the plan does not provide for payment of postpetition interest by a solvent debtor to which the creditor would be entitled under chapter 7, the Court may consider the Section 726(a)(5) to determine if the plan is confirmable. *See* 11 U.S.C. § 1129(a)(7). The "best interests of creditors" test is applicable *at the time of confirmation* and only if a creditor objects to confirmation.

▪▪▪ In this case, all Class 4 claimants, including Arnold, accepted the plan. Certification of Ballots filed July 12, 2001 (Doc. 314). Thus, all Class 4 claim holders waived the right to insist upon receiving the amount "such holder would so receive ... if the debtor were liquidated under chapter 7." *See M & I Thunderbird Bank v. Birmingham (In re Consolidated Water Utilities, Inc.),* 217 B.R. 588, 592 (9th Cir. BAP 1998) ("best interests of creditors" test applies only when class of impaired creditors do not accept plan). After confirmation, the plan became binding as a new contract between the debtor and interested parties, regardless of whether it would have survived the "best interests of creditors" test. *See, e.g., United States v. Victor,* 121 F.3d 1383, 1386 (10th Cir.1997) (creditors who are not treated consistently with Code in plan must object and obtain relief before confirmation of plan).

---

**24.** Postpetition interest also accrues when a debt is determined to be nondischargeable because in such cases, the postpetition interest is payable by the debtor, not the estate, and therefore the claim need not be "allowed" under Section 502. *See Johnson v. IRS (In re Johnson),* 146 F.3d 252, 260 (5th Cir.1998).

In addition, even if Arnold had invoked Section 1129(a)(7) at confirmation, the Disclosure Statement indicated that amount of claims filed against the Debtors exceeded the value of the Debtors' unencumbered assets by hundreds of millions of dollars, establishing the Debtors as insolvent as of the effective date of the Plan. The post-confirmation efforts of the Plan Agent, the secured lender, the gas claimants and Davis in the year following confirmation resulted in the Global Settlement of those claims on terms very favorable to the Debtors. At the time of confirmation, however, Class 4 claimants would not have been entitled to demand a plan that pay postpetition interest under the "best interests of creditors" test.

In a case factually similar to this case, the Sixth Circuit Court of Appeals determined that the "best interests of creditors" test contained in the confirmation requirement of Section 1129(a)(7) could not be applied to allow postpetition interest to unsecured creditors after confirmation of a plan in which postpetition interest was not specifically contemplated and approved. *Thompson v. Kentucky Lumber Co. (In re Kentucky Lumber Co.)*, 860 F.2d 674 (6th Cir.1988). In *Thompson*, the debtor appeared hopelessly insolvent at the time of confirmation, its only unencumbered asset being a contingent unliquidated claim against Ralston–Purina, then in litigation. The creditors did not object to a plan that provided for payment of 30% of their claims on the effective date and the balance "pro rata, or in full, to the extent such funds are available" with the proceeds of the Ralston–Purina litigation. After the plan was confirmed, the Ralston–Purina claim was settled for an amount that exceeded the amount of unpaid unsecured claims. Focusing on the surplus that transformed the hopelessly insolvent

debtor into a solvent one, the unsecured claimants claimed entitlement to postpetition interest on their claims, arguing that Sections 726(a)(5) and 1129(a)(7) required the payment of interest on unsecured claims from the surplus before any funds were returned to the debtor.

The Sixth Circuit rejected the application of the "best interests of creditors" test, a pre-confirmation requirement, to assess what the unsecured creditors would be entitled to receive in a hypothetical liquidation occurring years after confirmation. *Id.* at 678. Since no impaired creditor objected to its treatment under the plan, and the plan was confirmed notwithstanding the possibility of later solvency, the panel held that the "unsecured creditors are simply too late in making their claim for postpetition interest. These creditors settled for payment of 30 cents on the dollar with the possibility of being paid in full if the debtor was successful in his claim against Ralston–Purina." *Id.* at 679. The Court held that the plan should be enforced as confirmed. *Id. See also M & I Thunderbird Bank*, 217 B.R. at 592 (same result under similar facts).

Some courts, recognizing that Section 726 is not directly applicable in chapter 11, hold that equity requires that the policy underlying Section 726 be implemented in a chapter 11 case if the debtor becomes solvent after confirmation. *See Groundhog, Inc. v. San Joaquin Estates, Inc. (In re San Joaquin Estates, Inc.)*, 64 B.R. 534, 536 (9th Cir. BAP 1986) (it is not clear from the opinion whether the objection to allowance of postpetition interest was made prior to confirmation or post-confirmation: the effect of confirmed plan on the decision to allow postpetition interest is not discussed); [25] *In re Carter*, 220 B.R.

**25.** The Court notes that the Bankruptcy Appellate Panel of the Ninth Circuit later held

411, 414 (Bankr.D.N.M.1998) (discussion of allowance of postpetition interest appears in dicta because the debtor and creditor agreed that postpetition interest was payable but disagreed about the rate of interest); *In re Gaines,* 178 B.R. 101 (Bankr. W.D.Va.1995) (confirmed plan did not prohibit later allowance of postpetition interest and appeared to anticipate that the liquidation would generate a surplus; court interpreted plan treatment of payment "in full" to include postpetition interest to extent that estate generates a surplus); *Boyer v. Bernstein (In re Boyer),* 90 B.R. 200, 201 (Bankr.D.S.C.1988) (again the reason for allowing postpetition interest is dicta because the parties conceded that such interest was payable if estate proved solvent; in dispute was appropriate rate). These courts conclude that although the Bankruptcy Code does not explicitly provide for postpetition interest on unsecured claims in a solvent chapter 11 case, a bankruptcy court has the *discretion* to allow postpetition interest after weighing the equities. For this proposition, many of these courts rely specifically on a pre-Code case issued by the United States Supreme Court. *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 163, 67 S.Ct. 237, 91 L.Ed. 162 (1946).

The viability of *Vanston's* grant of equitable discretion to allow postpetition interest in light of the existing statutory framework of the Bankruptcy Code is questionable, however. Prior to the enactment of the Bankruptcy Code, the accrual of postpetition interest was not prohibited by statute as it is under the Code's regime. *See Sexton v. Dreyfus,* 219 U.S. 339, 344, 31 S.Ct. 256, 55 L.Ed. 244 (1911). Rather, it was a matter of

federal common law and equity that "interest on the debtors' obligations ceases to accrue at the beginning of proceedings. Exaction of interest, where the power of a debtor to pay even his contractual obligations is suspended by law, has been prohibited because it was considered in the nature of a penalty imposed because of delay in prompt payment-a delay necessitated by law if the courts are properly to preserve and protect the estate for the benefit for all interests involved." *Vanston,* 329 U.S. at 163, 67 S.Ct. 237. Further, "[a]ccrual of simple interest on unsecured claims in bankruptcy was prohibited in order that the administrative inconvenience of continuous recomputation of interest causing recomputation of claims could be avoided." *Id.* at 164, 67 S.Ct. 237. *See also Nicholas v. United States,* 384 U.S. 678, 682, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966) (the rule is "grounded in historical considerations of equity and administrative convenience").

In *Vanston,* the Supreme Court noted that courts, invoking their equitable discretion, had routinely allowed postpetition interest to accrue to a *secured* creditor if the value of the collateral exceeded the outstanding debt. *Id.* at 164, 67 S.Ct. 237. Since equity allowed oversecured creditors to recover postpetition interest, the Court likewise examined the equities to determine whether the particular *undersecured* creditors before them should be permitted to benefit from a surplus of the liquidated estate by recovering interest that would have accrued but for the equitable prohibition. *Id.* at 164–65, 67 S.Ct. 237. Applying equitable principles, the court denied postpetition interest to these creditors

---

that a confirmed plan that did not specifically provide for payment of postpetition interest to unsecured creditors *precluded* a later claim for such interest when the estate became solvent as a result of the surprisingly successful

post-confirmation auction of assets. *See M & I Thunderbird Bank,* 217 B.R. at 592. "Viewing the Plan and disclosure statement in toto, it appears that postpetition interest was not contemplated." *Id.* at 591.

chiefly because of the character of the interest—"interest on interest"—which accrued only because the "equity receivership intervened" and prevented the payment of the original interest. *Id.* at 165, 67 S.Ct. 237. The Court concluded that the "interest on interest" claim constituted a penalty resulting from the injunction against payment of the original interest, which the subordinate (unsecured) creditors should not be forced to bear.

This Court is not comfortable with the notion that the *Vanston* case gives permission to present-day bankruptcy courts bound by the Bankruptcy Code to override Section 502(b) of the Code by invoking equity. The Code specifically adopted parts of the pre-Code jurisprudence concerning postpetition interest in Sections 502(b) and (b)(2), 506(b), and 726. Congress eliminated the subjectivity of pre-Code discretion and specifically prohibited allowance of postpetition interest by enacting Section 502(b) and specifically mandated allowance of such interest in enacting 506(b) and 726(a)(5). The concept that postpetition interest is a matter of the bankruptcy court's equitable discretion has been superseded by statute.

 In any event, the equities do not favor awarding postpetition interest to Arnold in this case because the surplus resulted from the Global Settlement in which all other claimants not only foreswore any claim to postpetition interest, but also significantly compromised their sizable claims. Contrary to his assertions. Arnold's management of the estate was not the cause of the surplus; as of his last day of employment, claims against the estate exceeded $200 million. The Court notes that Davis compromised his own unsecured claims in excess of $100 million (an amount that would have significantly diluted any recovery by Arnold) in order to facilitate the Global Settlement.

 Arnold's claim for attorney fees fails for the same reasons. In addition, Arnold has not prevailed on any disputed claim. Thus, the claim for attorney fees is also disallowed.

## V. Conclusion

Davis's objection to the First POC is sustained, and the First POC is allowed in the undisputed amount of $55,073. Davis's objection to the Second POC is sustained, and the Second POC is allowed in the undisputed amount of $3,549.77.